**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 22-4525**

———————

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

v.

MATTHEW RYAN HUNT,

        Defendant – Appellant.

———————

Appeal from the United States District Court for the Southern District of West Virginia, at Charleston. Irene C. Berger, District Judge. (2:21-cr-00267-1)

———————

Argued:  October 30, 2024                 Decided:  December 18, 2024

———————

Before WYNN, HARRIS, and HEYTENS, Circuit Judges.

———————

Affirmed by published opinion. Judge Heytens wrote the opinion, which Judge Wynn and Judge Harris joined.

———————

**ARGUED:** Stephen J. van Stempvoort, MILLER JOHNSON, Grand Rapids, Michigan, for Appellant. Mahogane Denea Reed, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Nicole M. Argentieri, Principal Deputy Assistant Attorney General, Lisa H. Miller, Deputy Assistant Attorney General, Appellate Section, Criminal Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; William S. Thompson, United States Attorney, Jeremy B. Wolfe, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee.

———————

TOBY HEYTENS, Circuit Judge:

In *United States v. Canada*, No. 22-4519, 2024 WL 5002188 (4th Cir. Dec. 6, 2024), this Court reaffirmed that 18 U.S.C. § 922(g)(1)—commonly known as the felon-in-possession statute—is facially constitutional, while leaving for another day whether (and if so, when) as-applied challenges may succeed. Today, we answer that question.

Before the Supreme Court's decisions in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), and *United States v. Rahimi*, 144 S. Ct. 1889 (2024), this Court held that a person who has been convicted of a felony cannot make out a successful as-applied challenge to Section 922(g)(1) "unless the felony conviction is pardoned or the law defining the crime of conviction is found unconstitutional or otherwise unlawful." *Hamilton v. Pallozzi*, 848 F.3d 614, 626 (4th Cir. 2017). Consistent with the Eleventh Circuit's decision in *United States v. Dubois*, 94 F.4th 1284 (11th Cir. 2024), we hold that neither *Bruen* nor *Rahimi* meets this Court's stringent test for abrogating otherwise-controlling circuit precedent and that our precedent on as-applied challenges thus remains binding. In addition—and in the alternative—we hold that Section 922(g)(1) would survive Second Amendment scrutiny even if we had the authority to decide the issue anew. Having concluded "there is no need for felony-by-felony litigation regarding the constitutionality of" Section 922(g)(1), *United States v. Jackson*, 110 F.4th 1120, 1125 (8th Cir. 2024), we reject appellant Matthew Hunt's as-applied challenge without regard to the specific conviction that established his inability to lawfully possess firearms.

## I.

In late 2021—after the Supreme Court's groundbreaking decisions in *District of*

2

*Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), but before *Bruen* or *Rahimi*—a grand jury charged Hunt with violating Section 922(g)(1). That statute prohibits people who have "been convicted in any court of" "a crime punishable by imprisonment for a term exceeding one year" from possessing firearms. 18 U.S.C. § 922(g)(1). The indictment identified Hunt's 2017 conviction for breaking and entering, in violation of West Virginia Code § 61-3-12, as the predicate offense for the Section 922(g)(1) charge.

In May 2022—the month before the Supreme Court decided *Bruen*—Hunt pleaded guilty without raising a Second Amendment challenge. On appeal, however, Hunt argues that Section 922(g)(1) "violates the Second Amendment, both facially and as-applied to" him. Hunt Br. 11. He also asserts the district court erred in applying a four-point enhancement to his offense level under Section 2K2.1(b)(6)(B) of the federal sentencing guidelines.

## II.

The parties disagree about the standard of review for Hunt's constitutional challenge. When properly preserved, this Court generally reviews constitutional claims de novo. See, *e.g.*, *United States v. Pruess*, 703 F.3d 242, 245 (4th Cir. 2012). But matters change when a defendant fails to timely raise an issue before the district court. In that situation, reviewing courts typically apply the more government-friendly plain-error doctrine. See, *e.g.*, *United States v. Olano*, 507 U.S. 725, 733–34 (1993).

In his opening brief—which was filed after *Bruen* but before *Rahimi*—Hunt spends several pages arguing the plain-error standard is inapplicable despite his admitted failure

3

to raise a Second Amendment argument in the district court. He relies on *Class v. United States*, 583 U.S. 174 (2018), which held that even an unconditional guilty plea does not "bar a criminal defendant from later appealing his conviction on the ground that the statute of conviction violates" the Second Amendment. *Id*. at 176. In Hunt's view, "[t]he same principles that motivated the decision in *Class* militate against finding forfeiture here." Hunt Br. 13. In contrast, the government's response brief—also filed before *Rahimi*—ignores that argument and simply asserts, in a single conclusory sentence, that the plain-error standard applies. See Gov't Br. 12.

After briefing was complete, this Court held the case in abeyance pending a decision in another case involving a facial challenge to Section 922(g)(1). Once that case was decided, Hunt asked permission to file supplemental briefs "[b]ecause numerous significant Second Amendment cases have been decided since Hunt filed his reply brief." ECF 45, at 1. The government did not oppose the motion, and this Court granted it.

In his supplemental brief, Hunt notes that the government never responded to his argument that the plain-error standard does not apply here. Hunt also points out that the Ninth Circuit agreed with his view in its since-vacated opinion in *United States v. Duarte*, 101 F.4th 657 (2024), vacated and reh'g en banc granted, 108 F.4th 786 (9th Cir. 2024) (mem.). In its supplemental brief, the government finally engages with Hunt's standard of review argument, contending in two brief paragraphs that Hunt's assertions improperly conflate waiver (the issue in *Class*) and forfeiture (the issue here), and that they conflict with the Supreme Court's consistent refusal to recognize a futility exception to plain-error review.

This is not how things are supposed to work. In the typical case—that is, one without a supplemental briefing order—the government's failure to respond to an argument featured prominently in an opening brief would have deprived this Court of an adversarial presentation about a disputed legal issue. True, there was a supplemental briefing order here. But we did not permit supplemental briefing to hear further argument about the relevance of *Class*—a decision that was already more than six years old at that point. Cf. *United States v. Heyward*, 42 F.4th 460, 470 n.6 (4th Cir. 2022) (emphasizing that parties may not use post-argument letters to advance arguments or present authorities that could have been included in the merits-stage briefs). And even in its supplemental brief, the government fails to address the main argument against plain-error review flagged by the Ninth Circuit's vacated decision in *Duarte*, which relies on the interplay between Federal Rules of Criminal Procedure 12 (which governs pretrial motions) and 52(b) (which governs appellate review of forfeited claims). See *Duarte*, 101 F.4th at 663 (discussing Rules 12(b)(3) and 52(b)).

We think the prudent course is to assume—solely for the sake of argument—that the plain-error standard does not apply here and that we review Hunt's constitutional claims de novo. We have often taken that approach when the standard of review is disputed, see, *e.g.*, *United States ex rel. Doe v. Credit Suisse AG*, 117 F.4th 155, 160–61 (4th Cir. 2024); *Bowman v. Stirling*, 45 F.4th 740, 752–53 (4th Cir. 2022); *United States v. Davis*, 184 F.3d 366, 372 n.7 (4th Cir. 1999), and neither party challenges our authority to do so. Such a course seems particularly warranted here, both because the briefing about the standard of review leaves much to be desired and a report by the federal rules advisory

5

committee specifically flags—but does not purport to resolve—questions about the proper relationship between Rule 12 and Rule 52. See *United States v. Guerrero*, 921 F.3d 895, 898 (9th Cir. 2019) (per curiam) (discussing the Report of the Advisory Committee on Federal Rules of Criminal Procedure to the Standing Committee on Rules of Practice and Procedure 5–6 (May 2013)).

## III.

Turning to the merits, we reject Hunt's facial and as-applied Second Amendment challenges. A panel of this Court has held that Section 922(g)(1) remains facially constitutional after *Bruen* and *Rahimi*, see *Canada*, 2024 WL 5002188, at *2, and we are bound by that decision. See, *e.g.*, *McMellon v. United States*, 387 F.3d 329, 333 (4th Cir. 2004) (en banc) ("one panel cannot overrule another"). For that reason, Hunt's facial challenge fails.

We also reject Hunt's as-applied challenge. First, we conclude that neither *Bruen* nor *Rahimi* abrogates this Court's precedent foreclosing as-applied challenges to Section 922(g)(1) and those decisions thus remain binding. Second—and in the alternative—we conclude that Section 922(g)(1) would pass constitutional muster even if we were unconstrained by circuit precedent.

## A.

"[A] panel of this court is bound by prior precedent from other panels" and may not overturn prior panel decisions unless there is "contrary law from an en banc or Supreme Court decision." *Taylor v. Grubbs*, 930 F.3d 611, 619 (4th Cir. 2019) (quotation marks removed). "We do not lightly presume that the law of the circuit has been overturned." *Id.*

6

(quotation marks removed). Instead, "[a] Supreme Court decision overrules or abrogates our prior precedent only if our precedent is *impossible* to reconcile with" that decision. *Short v. Hartman*, 87 F.4th 593, 605 (4th Cir. 2023) (quotation marks removed; emphasis added). "If it is possible for us to read our precedent harmoniously with Supreme Court precedent, we must do so." *Id.* (quotation marks removed).

Neither the Second Amendment nor *Bruen* are immune from these general rules. To the contrary, our en banc Court recently concluded that *Bruen* "did not abrogate" the Court's pre-*Bruen* holding that a Maryland statute regulating certain assault weapons was constitutional. *Bianchi v. Brown*, 111 F.4th 438, 448 (4th Cir. 2024) (en banc). Applying the same rules here, we conclude that this Court's previous decisions rejecting as-applied challenges to Section 922(g)(1) remain binding because they can be read "harmoniously" with *Bruen* and *Rahimi* and have not been rendered "untenable" by them. *Short*, 87 F.4th at 605 (first quote); *Rose v. PSA Airlines, Inc.*, 80 F.4th 488, 504 (4th Cir. 2023) (second quote).

The first relevant pre-*Bruen* decision is *United States v. Moore*, 666 F.3d 313 (4th Cir. 2012), which rejected facial and as-applied challenges to Section 922(g)(1). See *id.* at 319–20. *Moore* relied on the Supreme Court's statements in *District of Columbia v. Heller*, 554 U.S. 570 (2008), that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons" and that restrictions on felons possessing firearms were "presumptively lawful regulatory measures." *Id.* at 317–18 (quoting *Heller*, 554 U.S. at 626, 627 n.26). *Moore* further concluded the defendant there did "not fall within the category of citizens to which the *Heller* court ascribed the

7

Second Amendment protection of 'the right of *law-abiding responsible* citizens to use arms in defense of hearth and home.' " *Id.* at 319 (quoting *Heller*, 554 U.S. at 635).

To be sure, *Moore* left open the "possibility" that some hypothetical challenger could "rebut the presumptive lawfulness of § 922(g)(1) as applied" to that person. 666 F.3d at 320. But this Court's later decisions repeatedly rejected such challenges, including those brought by "allegedly non-violent felons." *Pruess*, 703 F.3d at 247; see *United States v. Smoot*, 690 F.3d 215, 221–22 (4th Cir. 2012). And this Court ultimately held "[a] felon cannot be returned to the category of 'law-abiding, responsible citizens' for the purposes of the Second Amendment . . . unless the felony conviction is pardoned or the law defining the crime of conviction is found unconstitutional or otherwise unlawful," thus foreclosing the vast majority of as-applied challenges. *Hamilton*, 848 F.3d at 626.

Those decisions are neither impossible to reconcile with *Bruen* and *Rahimi* nor rest on a mode of analysis that has been rendered untenable by them. This Court's post-*Heller* and pre-*Bruen* decisions relied on two strands of authority to reject as-applied challenges to Section 922(g)(1): (1) *Heller*'s pronouncement that restrictions on firearms possession by those who have been convicted of felonies were "longstanding" and "presumptively lawful"; and (2) a determination—stemming from *Heller*—that such individuals were, as a group, excluded from the category of "law-abiding, responsible citizens" whose conduct is protected by the Second Amendment. Nothing in *Bruen* or *Rahimi* contradicts either rationale.

Far from abandoning *Heller*'s language about "longstanding" and "presumptively lawful" restrictions on felons possessing firearms, the Supreme Court has repeatedly

reaffirmed its applicability. Two years after *Heller*, the plurality opinion in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), described *Heller* as making "clear . . . that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill'" and again "repeat[ed] those assurances." *Id.* at 786 (quoting *Heller*, 554 U.S. at 626). The Court's opinion in *Bruen* did not repeat those assurances. But that opinion also "did not mention felons or section 922(g)(1)," *Dubois*, 94 F.4th at 1293, and it described its holding as "consistent with" and "[i]n keeping with" *Heller*. See *Bruen*, 597 U.S. at 10, 17; see also *id.* at 72 (Alito, J., concurring) (noting that the Court's opinion "decide[d] nothing about who may lawfully possess a firearm"). And most recently, in *Rahimi*, the Court reiterated *Heller*'s pronouncement that "prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.'" *Rahimi*, 144 S. Ct. at 1889 (quoting *Heller*, 554 U.S. at 626, 627 n.26). In short, nothing in *Bruen* or *Rahimi* undermines—much less fatally—this Court's previous reliance on *Heller*'s express statements about this exact sort of law. Accord *Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211, 221–22 (4th Cir. 2024) (en banc) (considering *Bruen* and relying on *Heller's* "longstanding" and "presumptively lawful" language).

The same is true about this Court's pre-*Bruen* conclusion that people who have been convicted of felonies are outside the group of "law-abiding responsible citizen[s]" that the Second Amendment protects. *Moore*, 666 F.3d at 319; accord *Hamilton*, 848 F.3d at 626. To be sure, *Bruen* later disavowed the second step of this Court's former two-part test for considering Second Amendment challenges as "one step too many." 597 U.S. at 19

9

(rejecting "means-end scrutiny"). But *Bruen* also described the first step of our former test as "broadly consistent with *Heller*." *Id.* And our en banc Court has concluded that *Bruen* "did not disturb" the analysis this Court conducted under that "first step," including holdings about whether a given situation is "outside the ambit of the individual right to keep and bear arms." *Bianchi*, 111 F.4th at 448 (quotation marks removed).

Because *Bruen* rejected only one step of our former two-part test, the distinction between different types of pre-*Bruen* decisions matters. *Moore* did not rely on any sort of "means-end scrutiny" in rejecting the defendant's Second Amendment challenge. *Bruen*, 597 U.S. at 19. Instead, it held the defendant's conduct was "plainly outside the scope of the Second Amendment." *Moore*, 666 F.3d at 320. So too in *Pruess*, which said the defendant's "conduct lies outside the scope of the Second Amendment's protection" and rejected the defendant's assertion "that historical sources weigh in his favor." 703 F.3d at 246 & n.3. And again in *Hamilton*, which never discussed means-end scrutiny and resolved the case at "step one" of this Court's former test. 848 F.3d at 627. *Bruen* and *Rahimi* thus provide no basis for a panel to depart from this Court's previous rejection of the need for any case-by-case inquiry about whether a felon may be barred from possessing firearms. See *Hamilton*, 848 F.3d at 626–29.

## B.

What we have said so far is enough to reject Hunt's as-applied Second Amendment challenge. But even if we were deciding this case unconstrained by this Court's pre-*Bruen* precedent, Hunt's challenge would still fail. Under *Bruen*, courts must first consider whether "the challenged law regulates activity falling outside the scope of the [Second

10

Amendment] right as originally understood." 597 U.S. at 18 (quotation marks removed). If the law regulates activity protected by the right, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17. We conclude Hunt's as-applied challenge fails both parts of that test.

1.

Our en banc Court recently concluded "the limitations on the scope of the Second Amendment right identified in *Heller*" are properly assessed as part of *Bruen*'s first step because those limitations "are inherent in the text of the amendment." *United States v. Price*, 111 F.4th 392, 401 (4th Cir. 2024) (en banc). The proper inquiry, *Price* explained, requires us to "look[] to the historical scope of the Second Amendment," and use that history to interpret what is and is not protected by the constitutional text. *Id.*

*Heller* repeatedly described the core of the Second Amendment right as protecting "law-abiding" citizens. 554 U.S. at 625, 635. In contrast, *Heller* made clear that restrictions on firearms possession by those who are not law-abiding—*i.e.*, felons—are "presumptively lawful." *Id.* at 626, 627 n.26. These limitations arise from the historical tradition. See *id.* at 626 (referring to prohibitions on felons possessing firearms as "longstanding"); *id.* at 625 ("For most of our history . . . the Federal Government did not significantly regulate the possession of firearms by *law-abiding* citizens." (emphasis added)). Taken together, *Heller* instructs that the "*pre-existing* right" "codified" in the Second Amendment protects firearms possession by the law-abiding, not by felons. *Id.* at 592.

Nothing in *Bruen* or *Rahimi* alters this reading of *Heller*. As for *Bruen*, our en banc Court has already held that "[n]othing in *Bruen* abrogated *Heller*'s extensive discussion of

11

the contours of the scope of the right enshrined in the Second Amendment." *Price*, 111 F.4th at 400. The same is true of *Rahimi*, which pointedly repeated *Heller*'s statement that "prohibitions . . . on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.'" 144 S. Ct. at 1902 (quoting *Heller*, 554 U.S. at 626, 627 n.26)). We thus conclude that Section 922(g)(1) "regulates activity"—that is, the possession of firearms by felons—that "fall[s] outside the scope of the [Second Amendment] right as originally understood." *Bruen*, 597 U.S. at 18 (quotation marks removed).

2.

Even if Section 922(g)(1) did regulate activity within the scope of the Second Amendment, we would reach the same conclusion at the second step of the *Bruen* analysis.

*Rahimi* provides important guidance on this point. See 144 S. Ct. at 1897 (describing some lower courts as having "misunderstood the methodology of [the Supreme Court's] recent Second Amendment cases"). The Court emphasized that neither *Heller* nor *Bruen* "suggest[s] a law trapped in amber," and that the Second Amendment "permits more than just those regulations identical to ones that could be found in 1791." *Id.* at 1897–98. Instead, the relevant question is "whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition," including "[w]hy and how the regulation burdens the right." *Id.* at 1898 (emphasis added). Modern regulations need not be "a dead ringer" or "historical twin" for a founding-era regulation; only a "historical analogue" is required. *Id.* at 1898, 1903 (quotation marks removed).

Like the Eighth Circuit, we "conclude that legislatures traditionally employed status-based restrictions to disqualify categories of persons from possessing firearms" and

12

that "Congress acted within the historical tradition when it enacted § 922(g)(1)." *United States v. Jackson*, 110 F.4th 1120, 1129 (8th Cir. 2024). In canvassing the historical record, the Eighth Circuit identified "two schools of thought" justifying regulations restricting felons from possessing firearms. *Id.* at 1126. One justification is that "legislatures traditionally possessed discretion to disqualify categories of people from possessing firearms to address a danger of misuse by those who deviated from legal norms." *Id.* at 1127. The second is that legislatures had the ability to disarm particular people "to address a risk of dangerousness," which readily attaches to people who have already been found guilty of having broken the law. *Id.* We agree that "either reading" of the relevant history "supports the constitutionality of § 922(g)(1) as applied to [Hunt] and other convicted felons." *Id.* at 1126.

To begin, the historical record contains ample support for the categorical disarmament of people "who have demonstrated disrespect for legal norms of society." *Jackson*, 110 F.4th at 1127. Early legislatures regularly punished felons and other non-violent offenders with estate forfeiture or death—far greater punishments that "subsumed disarmament." *Id.* Indeed, "[t]he idea of felony [was] so generally connected with that of capital punishment," it was "hard to separate them." 4 William Blackstone, *Commentaries* 98 (1st ed. 1769).

Hunt insists this point proves too much because "[f]elons . . . don't lose other rights guaranteed in the Bill of Rights even though an offender who committed the same act in 1790 would have faced capital punishment." Hunt Suppl. Br. 10 (quotation marks removed). That argument cannot be squared with *Rahimi*, which also relied on a greater-

13

includes-the-lesser theory in holding that "if imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament . . . is also permissible." 144 S. Ct. at 1902. As the Supreme Court has explained, the Second Amendment "codified a *pre-existing* right." *Heller*, 554 U.S. at 592. And "it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms," *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019), even though the same person may have continued to enjoy certain other constitutional protections.

At any rate, there is more. Colonial-era offenders who committed non-violent hunting offenses were ordered to forfeit their firearms. See, *e.g.*, Act of Oct. 9, 1652, *Laws and Ordinances of New Netherlands* 138 (1868) (forbidding partridge and game hunting "on pain of forfeiting the gun"). And a contemporaneous source that *Heller* described as "highly influential," 554 U.S. at 604, maintained people should have a right to bear arms "*unless for crimes committed*, or real danger of public injury from individuals." 2 Bernard Schwartz, The Bill of Rights: A Documentary History 665 (1971) (emphasis added) (quoting "the highly influential minority proposal in Pennsylvania" discussed in *Heller*).

English and colonial American governments also enacted other types of categorical bans on the possession of firearms by those who refused to follow less formal legal norms. Governments disarmed "non-Anglican Protestants who refused to participate in the Church of England," "people who refused to declare an oath of loyalty," and others. *Jackson*, 110 F.4th at 1126. True, many of these specific prohibitions would today be understood to violate other constitutional restrictions. But those examples remain "relevant here in

14

determining the historical understanding of the right to keep and bear arms." *Id.* at 1127. And those examples suggest legislatures historically had the power to disarm categories of people based on a legislative determination that such people "deviated from legal norms," and "not merely to address a person's demonstrated propensity for violence." *Id.*

Hunt insists the evidence that the founding generation disarmed felons is mixed at best. But Hunt's argument commits the same mistake the Supreme Court identified in *Rahimi*—insisting on a historical "twin" rather than an "analogue." 144 S. Ct. at 1903. To evaluate whether a historical analogue justifies a modern regulation, we consider "[w]hy and how the regulation burdens the right." *Id.* at 1898. And here, both the why (whether "modern and historical regulations" impose a "burden" on the Second Amendment right that was "comparably justified") and the how (whether the regulations "impose a comparable burden on the right of armed self-defense") support Section 922(g)(1)'s constitutionality. *Bruen*, 597 U.S. at 29. Just as early legislatures retained the discretion to disarm categories of people because they refused to adhere to legal norms in the pre-colonial and colonial era, today's legislatures may disarm people who have been convicted of conduct the legislature considers serious enough to render it a felony.

When asked about this point at oral argument, Hunt worried about allowing legislatures to make certain conduct a felony and then prohibiting people from exercising their otherwise constitutionally protected right to possess a firearm for having engaged in that conduct. See Oral Arg. 31:40–33:55. We agree the power to determine the content of the criminal law is serious business. But legislatures have always had that power, and it is subject to few constitutional constraints. And there is no doubt that legislatures can subject

15

people found to have engaged in serious criminal conduct to consequences the Constitution would otherwise forbid, including—most notably—deprivations of "life, liberty, or property." U.S. Const. amend. XIV, § 1. We conclude the same is true of the ability to lawfully possess a firearm.

Our conclusion that Section 922(g)(1) satisfies *Bruen*'s second step remains true "[i]f the historical regulation of firearms possession is viewed instead as an effort to address the risk of dangerousness." *Jackson*, 110 F.4th at 1127. "Legislatures historically prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed." *Id.* at 1128. A determination of dangerousness was sometimes made by status, like "[r]eligious minorities, such as Catholics," or "Native Americans," and sometimes by conduct, like non-oath-takers. *Id.* at 1126. Those historical restrictions swept broadly, disarming all people belonging to groups that were, in the judgment of those early legislatures, potentially violent or dangerous. Even though "not all Protestants or Catholics in England, not all Native Americans, not all Catholics in Maryland, not all early Americans who declined to swear an oath of loyalty . . . were violent or dangerous persons," all could be disarmed. *Id.* at 1128. "This history demonstrates that there is no requirement for an individualized determination of dangerousness as to each person in a class of prohibited persons." *Id.* Instead, as here, past conduct (like committing a felony) can warrant keeping firearms away from persons "who might be expected to misuse them." *Id.*

Based on this history, we conclude that Section 922(g)(1) is also justified as "an effort to address a risk of dangerousness." *Jackson*, 110 F.4th at 1127. In enacting that

16

statute, Congress found that "the ease with which any person can acquire firearms other than a rifle or shotgun (including criminals . . .) is a significant factor in the prevalence of lawlessness and violent crime in the United States." Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, § 901(a)(2), 82 Stat. 197, 225; see *Barrett v. United States*, 423 U.S. 212, 218 (1976) (noting that Congress "sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous"). And because felons, by definition, have "demonstrated disrespect for legal norms of society," the legislature has determined that "the category as a whole present[s] an unacceptable risk of danger if armed." *Jackson*, 110 F.4th at 1127–28. That legislative judgment accords with historical tradition regulating non-law-abiding persons and is consistent with the Supreme Court's repeated instruction that longstanding prohibitions "on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.' " *Rahimi*, 144 S. Ct. at 1902 (citations removed). "[T]hese assurances by the Supreme Court, and the history that supports them," reinforces our conclusion that "there is no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1)." *Jackson*, 110 F.4th at 1125. We thus reject Hunt's as-applied constitutional challenge at step two of the *Bruen* analysis as well.

## IV.

Hunt's final argument involves his sentence. The Federal Sentencing Guidelines call for a four-level increase in a defendant's base offense level if that defendant "used or possessed any firearm or ammunition in connection with any other felony offense." U.S.S.G. § 2K2.1(b)(6)(B). The district court applied that enhancement here. It first found

17

it "more likely so than not that [Hunt] fired [a] gun . . . inside an apartment building, while under the influence of controlled substances during a domestic violence incident, with another person present in the apartment." JA 61. The court further concluded that Hunt's conduct "constitute[d] wanton endangerment" under West Virginia law. *Id.* "In assessing a challenge to a sentencing court's application of the Guidelines, we review the court's factual findings for clear error and its legal conclusions de novo." *United States v. Allen*, 446 F.3d 522, 527 (4th Cir. 2006).

Hunt does not challenge the district court's legal conclusion that the conduct described in the factual findings is an "act with a firearm which creates a substantial risk of death or serious bodily injury to another." W. Va. Code § 61-7-12 (describing the felony of wanton endangerment). Instead, Hunt argues that the district court clearly erred in finding—by a preponderance of the evidence—that he fired a gun in the apartment.

We are unpersuaded. For one thing, there was significant evidence that *someone* fired a gun: a neighbor heard gunshots from Hunt's apartment just minutes before the police arrived; officers found bullet casings on the floor of the apartment; and tests revealed gunshot residue on both Hunt and the other person in his apartment. Further, if somebody fired a gun, there was significant evidence that it was Hunt. When officers entered the apartment, the gun was lying on the bed next to Hunt and a bullet casing was on the bedroom floor. The other person in the apartment was unconscious in a different room. What is more, Hunt later seemed to admit that he had, in fact, fired the gun, asking the other person who had been in the apartment during a recorded phone call: "What was I shooting at? I didn't shoot at you, did I?" Taken as a whole, we conclude there was

18

sufficient evidence for the district court to determine, by a preponderance of the evidence, that Hunt fired a gun in the apartment.

*    *    *

The district court's judgment is

*AFFIRMED*.