SUPREME JUDICIAL COURT 
 
 COMMONWEALTH vs. NATHANIEL RODRIGUEZ

 
 Docket:
 SJC-13727
 
 
 Dates:
 May 5, 2025 – September 30, 2025
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, Wendlandt, Georges, Dewar, & Wolohojian, JJ.
 
 
 County:
 Middlesex
 

 
 Keywords:
 Firearms. Social Media. Practice, Criminal, Motion to suppress, Dismissal. Constitutional Law, Equal protection of laws, Right to bear arms. License
 
 

             Complaints received and sworn to in the Lowell Division of the District Court Department on March 11 and July 6, 2020.
            A pretrial motion to suppress evidence was heard by Zachary M. Hillman, J.; a motion to dismiss was heard by John F. Coffey, J., and conditional pleas of guilty were accepted by him.
            The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.
            Nancy Dolberg, Committee for Public Counsel Services, for the defendant.
            Aaron J. Staudinger, Assistant District Attorney, for the Commonwealth.
            Maithreyi Nandagopalan, of New Mexico, & Mason A. Kortz, for Innocence Project & others, amici curiae, submitted a brief.
            Katharine Naples-Mitchell & Joshua M. Daniels, for Massachusetts Association of Criminal Defense Lawyers & another, amici curiae, submitted a brief.
            GAZIANO, J.  A member of the Lowell police department's gang unit created an undercover profile on the social media platform Snapchat.  After becoming Snapchat "friends" with the defendant, the officer observed a video recording posted by the defendant on Snapchat in which the defendant is seen discharging a firearm out the window of a car.  The defendant was subsequently charged with and ultimately pleaded guilty to various firearms-related offenses.  At issue on appeal are two questions.  The first question is whether the defendant produced sufficient evidence to raise a reasonable inference that the officer's Snapchat investigation of the defendant was racially motivated, such that a District Court judge erred in denying the defendant's motion to suppress evidence obtained in violation of his equal protection rights.  The second question is whether the Commonwealth's then-current resident firearm licensing scheme under which the defendant was charged was facially violative of the Second Amendment to the United States Constitution, such that another District Court judge erred in denying the defendant's motion to dismiss the firearms charges.
            We hold as follows.  First, the defendant successfully raised a reasonable inference of selective enforcement under the "totality of the circumstances" test articulated in Commonwealth v. Long, 485 Mass. 711, 724-725 (2020).  We therefore remand for a further evidentiary hearing at which the Commonwealth will have the burden of rebutting the inference of selective enforcement by establishing a race-neutral reason for the officer's enforcement conduct.  Second, the defendant has failed to establish that the Commonwealth's resident firearm licensing scheme was facially unconstitutional.  We therefore affirm the denial of the defendant's motion to dismiss the firearms charges.[1]
            1.  Background.  a.  Facts.  In denying the defendant's motion to suppress on equal protection grounds, the motion judge made a series of factual findings that the defendant does not challenge for clear error.  We summarize these facts, supplemented by uncontroverted evidence that the judge explicitly or implicitly credited.  See Commonwealth v. Isaiah I., 448 Mass. 334, 337 (2007), S.C., 450 Mass. 818 (2008).
            From approximately 2019 to 2021, Detective Matthew Krug was a member of the Lowell police department's gang unit.  Krug estimated that between 2016 and 2019 there were five or six significant gangs operating in Lowell.  Among other duties, the gang unit investigated gang activity in Lowell by monitoring various social media platforms, including Snapchat.
            Snapchat is a social media platform that enables users to post "stories," which can include photographs or video recordings.  To become a Snapchat user, a person must create an account with a "username."  Although not required to do so, a Snapchat user also has the option of creating and displaying an animated figure called a "bitmoji," which is viewable by other users.[2]  If the user's account is set to "private," the "stories" he or she posts are visible only to other users with whom he or she is "friends."  Users become "friends" when one user sends a "friend request" to another user who then accepts it.  There are several means by which Snapchat users can acquire new "friends."  Snapchat users can see the list of "friends" associated with other Snapchat accounts; users can call attention to other users by "tagging" them in a "story"; and the Snapchat platform itself suggests other users with whom a user may want to become "friends."
            In 2019, Krug created an undercover, fictitious Snapchat account.  In doing so, he selected a "nonwhite" name and a bitmoji of a "nonwhite" person.[3]  He then began to send "friend" requests to users who were already Snapchat "friends" with the undercover profiles of other gang unit members.  His goal was not to monitor specific individuals whom he suspected of criminal activity, but rather to create as large a pool of "friends" as possible, in part so as to appear like an actual Snapchat user rather than a "spam" account.  Once Krug became "friends" with someone, he could monitor that user's stories on a department-issued iPad brand tablet computer.  If Krug saw something in a "story" that was indicative of criminal behavior, he would record the story, save it in a private digital library, and take protective action if and when there were immediate safety concerns.  At the evidentiary hearing, when asked to describe the "affluence" of the "hotspot crime areas" in Lowell monitored by the gang unit, Krug replied that "[t]here are housing projects there" and that "there's a variety of cultures that live in that area."
            At some point during his time in the gang unit, Krug, through his undercover Snapchat account, became "friends" with a user whose username was "boss man Nate."  Krug could not recall whether he sent or received the "friend" request.  Although Krug subsequently came to believe that the defendant -- whom Krug had previously stopped for a motor vehicle infraction -- was "boss man Nate," at the time they became "friends," Krug did not know the identity of the user.  He also did not know at that time the race or ethnicity of "boss man Nate," nor was there any evidence of a bitmoji associated with that account.
            On March 7, 2020, the "boss man Nate" account posted a video recording depicting someone shooting a firearm with a distinctive turquoise frame outside the window of a car believed to be on a road in Lowell.  Police learned from Snapchat data where the incident occurred and subsequently used that data to locate the defendant in the suspect vehicle, a Honda Accord.  After obtaining a warrant to search the defendant's Honda, police found a firearm in the trunk of the car that matched the firearm seen in the March 7 video recording.  In addition, spent shell casings found in the car matched shell casings found on the street at the location of the shooting.  The defendant did not have a license to carry a firearm.
            b.  Procedural history.  On March 11, 2020, a criminal complaint issued from the Lowell Division of the District Court Department charging the defendant with multiple firearms offenses, including (1) discharging a firearm within 500 feet of a building, in violation of G. L. c. 269, § 12E; (2) carrying a loaded firearm without a license, in violation of G. L. c. 269, § 10 (n); (3) possession of ammunition without a firearm identification (FID) card, in violation of G. L. c. 269, § 10 (h) (1); and (4) improper storage of a firearm, in violation of G. L. c. 140, § 131L (a) and (b).[4]  In addition, a one-count complaint subsequently issued from the same District Court charging the defendant with carrying a firearm without a license, in violation of G. L. c. 269, § 10 (a).
            In July 2021, the defendant filed a motion for discovery related to a selective enforcement claim.  A judge allowed the defendant's discovery motion in a written order on August 11, 2021.  Specifically, the judge ordered the Commonwealth to provide the defense with (1) all policies, procedures, written protocols, and training manuals used by the Lowell police department as of March 2020 relating to social media investigations; and (2) all police reports and investigatory notes generated by the Lowell police department from March 1, 2018, to June 1, 2021, for Snapchat investigations that resulted in criminal charges.[5]  In responding to part (1) of the order, the Lowell police department revealed that it had no policies, procedures, or training manuals governing social media monitoring.  With respect to part (2), the department provided seven police reports stemming from Snapchat investigations undertaken during the relevant time period, which included the report related to the investigation involving the defendant.  One of the reports did not result from any officer's independent monitoring of Snapchat accounts, but rather from the parents of a child inviting officers to view their child's Snapchat account on their child's cell phone.  Another report did not identify the race or ethnicity of the user.  Of the five reports stemming from independent monitoring of Snapchat accounts for which the suspect's race or ethnicity was identifiable, all five suspects were nonwhite –- being either Asian, Hispanic, or Black.
            In May 2022, the defendant filed a motion to suppress, arguing that the evidence obtained as a result of Lowell police officers' selective monitoring of Snapchat based on race violated his equal protection rights.  An evidentiary hearing on the defendant's motion to suppress was held before a second District Court judge.  Ultimately, the judge denied the defendant's motion to suppress in August 2023, concluding that the defendant had failed to raise a reasonable inference that Krug's investigation was motivated by race.[6]
            In November 2023, the defendant filed a motion to dismiss the charges pertaining to his alleged unlicensed status.  The defendant argued, inter alia, that two statutes -- G. L. c. 140, § 131 (d), as amended through St. 2018, c. 123, §§ 11, 12 (§ 131 [d]), and G. L. c. 269, § 10 (a) (2), as amended through St. 2014, c. 284, § 90 (§ 10 [a] [2]) -- "impermissibly infringed on the fundamental right to keep and bear arms as guaranteed by the Second Amendment."  On November 17, 2023, a third District Court judge denied the motion to dismiss orally and by margin endorsement, concluding that the constitutionally problematic provision in § 131 (d) was severable.
            In January 2024, the defendant entered a conditional plea of guilty on his pending charges, reserving the right to appeal from the orders denying his motion to suppress and motion to dismiss.  The defendant was sentenced to eighteen months in a house of correction for carrying a firearm without a license and an additional one day to be served consecutively in a house of correction for carrying a loaded firearm without a license.  For the remaining offenses, the defendant received concurrent sentences of eighteen months or less in a house of correction.  After the defendant timely appealed, we transferred the appeal to this court on our own motion.
            2.  Discussion.  The defendant advances two principal arguments on appeal.  First, the defendant argues that the second judge erred in denying his motion to suppress because, under the "totality of the circumstances" test articulated in Long, 485 Mass. at 724-725, there exists a reasonable inference that Krug's monitoring of the defendant's Snapchat account was motivated at least in part by race.  Second, the defendant argues that the third judge erred in denying his motion to dismiss because under the "historical tradition" test articulated in New York State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1, 17 (2022) (Bruen), the restrictions on resident license issuance embodied in § 131 (d) rendered the criminalization of unlicensed possession embodied in § 10 (a) (2) facially unconstitutional and therefore void.  We address each contention in turn.
            a.  The selective enforcement claim.  In reviewing the denial of the defendant's motion to suppress, "we accept the motion judge's subsidiary findings absent clear error, and make an independent determination whether the judge properly applied constitutional principles to the facts as found" (quotation and citation omitted).  Commonwealth v. Robinson-Van Rader, 492 Mass. 1, 9 (2023).  The constitutional principle at issue is the equal protection guarantee under arts. 1 and 10 of the Massachusetts Declaration of Rights, which "prohibit[s] discriminatory application of impartial laws" (citation omitted).  Long, 485 Mass. at 717.  In particular, although the application of the criminal law inevitably involves some degree of selectivity, the exercise of that discretion is compatible with equal protection only if it "is not based on an unjustifiable standard such as race, religion or other arbitrary classification" (quotation and citation omitted).  Commonwealth v. Lora, 451 Mass. 425, 437 (2008).
            The discriminatory application of criminal laws can take the form of selective prosecution or selective enforcement.  Selective prosecution occurs when "a prosecutor pursues similar cases differently based on race or another protected class" (quotation and citation omitted).  Robinson-Van Rader, 492 Mass. at 19.  Selective prosecution claims are evaluated under a tripartite framework articulated in Commonwealth v. Franklin, 376 Mass. 885, 894–895 (1978).  The remedy for a successful selective prosecution claim is dismissal of the charges the pursuit of which was tainted by discrimination.  Long, 485 Mass. at 717.  By contrast, selective enforcement occurs when there is "discriminatory policing in the investigatory phase of a case."  Commonwealth v. Dilworth, 494 Mass. 579, 587 (2024).  Selective enforcement claims are evaluated under a burden-shifting framework articulated in Long, supra at 724-726.  The remedy for a successful selective enforcement claim is suppression of the evidence obtained via discriminatory enforcement.  Id. at 726.  Here, the defendant's claim is of selective enforcement.
            Under Long, 485 Mass. at 713, a defendant "bears the burden of establishing, by motion, a reasonable inference that the officer's [enforcement] decision . . . was motivated by race or another protected class."  This requirement "means simply that the defendant must produce evidence upon which a reasonable person could rely to infer that the officer discriminated on the basis of the defendant's race or membership in another protected class."  Id. at 723-724.  Discriminatory motivation exists whenever the challenged enforcement decision "was motivated at least in part by race."  Id. at 726.  To establish a reasonable inference of such motivation, "the defendant must point to specific facts from the totality of the circumstances."  Id. at 713.  If that inference is established, the defendant is "entitled to a hearing at which the Commonwealth would have the burden of rebutting the inference."  Id.  Absent such a rebuttal, as noted, "any evidence derived from the [selective enforcement] would be suppressed."  Id.
            More recent decisions have clarified the scope and meaning of Long's test for selective enforcement.  Long itself concerned a racially selective traffic stop.  See Long, 485 Mass. at 712.  As such, it did not explicitly "address whether this [burden-shifting] standard was to extend to all claims of selective enforcement."  Robinson-Van Rader, 492 Mass. at 18.  We subsequently clarified that "the equal protection standard established in Long for traffic stops applies equally to pedestrian stops and threshold inquiries, as well as other selective enforcement claims challenging police investigatory practices."  Id.  Likewise, although Long did not explicitly address the applicability of its framework to online investigatory techniques by police, we subsequently determined that "[a] physical intrusion, akin to a traffic stop or threshold inquiry, is not required" for an enforcement action to fall within the scope of the Long equal protection analysis.  Dilworth, 494 Mass. at 588.  On the contrary, the Long standard applies generally to "alleged discriminatory policing in the investigatory phase of a case."  Id. at 587.  As such, "[i]t encompasses a claim that the police monitored social media accounts" -- including, in particular, Snapchat accounts -- "based on the target's race or membership in another protected class."  Id. at 587-588.
            In short, the defendant's claim that his Snapchat account was monitored at least in part because of race falls squarely within the scope of Long's selective enforcement framework.  Therefore, we evaluate the "totality of the circumstances" to determine whether the defendant has established "a reasonable inference that [Krug's] decision to [monitor the defendant's Snapchat account] was motivated by race."  Long, 485 Mass. at 713.  Three facts are particularly relevant in this regard.
            The first fact is Krug's decision to select a "nonwhite" username and "nonwhite" bitmoji for his undercover Snapchat account.[7]  As a threshold matter, we recall that the classification of persons as "nonwhite" is a classification by race and that race is a protected classification.  See Smith v. Commonwealth, 420 Mass. 291, 298 (1995) ("nonwhites . . . is a group characterized by race[,] and race is a protected classification").  In addition, although the record does not reveal the racial composition of Krug's Snapchat "friends," Krug's decision to represent himself as "nonwhite" in the context of an undercover Snapchat account –- while certainly not dispositive -- is probative of Krug's intention to "friend" and thereby monitor nonwhite persons.  Cf. Dilworth, 494 Mass. at 580 (judge ordered disclosure of undercover bitmojis and usernames on ground that such information would "'persuasively and visually' demonstrate the racial compositions of individuals targeted for Snapchat monitoring").  To that extent, Krug's selection of a "nonwhite" username and a "nonwhite" bitmoji suggests that his monitoring activities may have unlawfully targeted a protected class.  This inference gains further support from the fact that the social media platform did not require Krug to choose a "nonwhite" username or a "nonwhite" bitmoji.  On the contrary, Krug could have chosen to use a race-neutral username and a race-neutral bitmoji or indeed no bitmoji at all.  See Commonwealth v. Carrasquillo, 489 Mass. 107, 110 (2022) (officer conducting undercover Snapchat investigation used "default picture assigned by Snapchat" for profile picture).
            The second fact is Krug's characterization of neighborhoods with high rates of gang activity.  In describing the "affluence" of neighborhoods with high rates of gang activity monitored by the gang unit, Krug said that "[t]here are housing projects there" with "a variety of cultures."  Although this reply is somewhat opaque, the phrase "variety of cultures" can be reasonably interpreted to refer to the racial composition of the gang "hotspots."  Cf. Villanueva v. Carere, 85 F.3d 481, 488 (10th Cir. 1996) ("'culture' . . . might in some circumstances be used as a proxy for ethnicity, race, national origin or some other suspect classification").  To that extent, Krug's oblique reference to race in response to a question about "affluence" provides some support for the reasonable inference that Krug brought a "racial lens" to his monitoring practices.
            The third fact is the racial composition of defendants charged as a result of Snapchat monitoring in Lowell, see Long, 485 Mass. at 730-731 (statistical data may be used to establish reasonable inference), in combination with the Lowell police department's lack of policies or procedures governing social media monitoring.  As noted, the pool of "Snapchat defendants" in Lowell appears to be exclusively nonwhite:  all five persons charged as a result of Snapchat monitoring for whom information about race or ethnicity is available are nonwhite, with each identified as either Asian, Black, or Hispanic.  Although this sample size is likely too small to provide a sound basis for a statistically significant conclusion, a pattern of enforcement decisions "need not be demonstrated to be statistically valid in order to support a reasonable inference."  Id. at 724 n.7.  Furthermore, the pool of "Snapchat defendants" in Lowell is also disproportionately nonwhite.  According to census data credited by the second judge, Lowell's population during the relevant time period was approximately fifty percent nonwhite and approximately fifty percent white.  See id. at 733 (census data may in appropriate circumstances be used as "benchmark data" on demographic distribution to compare against enforcement data in order to determine disparity in enforcement rate).  Yet, one hundred percent of those ensnared by Lowell's Snapchat monitoring were nonwhite.  While not conclusive, a fair inference from this small data set is that nonwhite persons were approximately twice as likely to be charged as a result of Snapchat monitoring than their representation in the general population alone would predict.
            In short, the racial composition of Snapchat defendants in Lowell provides further support for a reasonable inference of selective enforcement.  That inference gains further support from the fact that the Lowell police department did not have any practices or policies governing social media monitoring.  See Long, 485 Mass. at 725 (listing "police department's policies and procedures" as factor when examining totality of circumstances).  In particular, the department did not have any practices or policies designed to ensure that racial motivations do not enter into officers' monitoring decisions.  To that extent, officers' monitoring decisions were effectively unconstrained.  In the context of that discretionary "vacuum," the exclusively and disproportionately nonwhite composition of Snapchat defendants in Lowell supports a reasonable inference of selective enforcement.
            Against the inference of selective enforcement, the Commonwealth's principal contention is that Krug's decision to monitor the defendant could not have been motivated by race because Krug did not know the race of "boss man Nate" at the time the two became "friends."  The denial of the defendant's motion to suppress was also predicated on that fact.  Although this contention has a surface appeal –- in that it raises the issue of how an officer can investigate a person on the basis of race if the officer does not know that person's race –- it does not suffice to defeat the reasonable inference of selective enforcement supported by the aforementioned facts.  This is so for three reasons.
            First, as a threshold matter, the Long standard directs us to consider the "totality of the circumstances" surrounding the challenged enforcement action.  Long, 485 Mass. at 713.  In particular, although the defendant must point to "specific facts," he need not identify a specific category of fact, such as statistical evidence; nor does a defendant need "[c]onclusive evidence."  Id. at 723-724.  Properly understood, the "totality of the circumstances" test directs us to evaluate particular facts in the broader context of the challenged enforcement action.  In other words, no one fact should be treated as dispositive.  To that extent, any suggestion that Krug's ignorance of the defendant's race at the time they became "friends" automatically defeats a reasonable inference of selective enforcement would be misplaced.  This fact, like any other, must be viewed in light of the "totality."
            Second, in contending that Krug's ignorance of the defendant's race precludes an inference of selective enforcement, the principal authority on which the Commonwealth relies cannot bear the weight given to it.  Specifically, the Commonwealth places considerable reliance on Commonwealth v. Stroman, 103 Mass. App. Ct. 122, 130 (2023), wherein the trial court judge effectively found that "because [the investigating officer] did not know the defendant's race before initiating the stop, as a matter of fact he was not engaging in racial profiling when he made the stop."  To begin, we note that the question in that case was whether the Commonwealth had successfully rebutted a reasonable inference of racial discrimination -- not whether the defendant had succeeded in establishing that "threshold" inference in the first place.  Id. at 124.  Furthermore, as the use of "as a matter of fact" would suggest, the conclusion that the officer was not engaged in racial profiling "because" he did not know the defendant's race does not stand for the general proposition that ignorance of a defendant's race precludes selective enforcement.  Id. at 130.  On the contrary, it is a fact-specific judgment that placed the officer's ignorance of the defendant's race in the context of the totality of the circumstances surrounding the stop.  See id. at 127-130.
            Finally, the premise that an officer's investigation of someone cannot be racially motivated if the officer does not know that person's race suffers from a basic logical flaw:  it is possible to investigate a person whose race an officer does not know where that person belongs to a certain group that is itself defined at least partly in terms of race.  This is especially true if an officer's decisions are the product of implicit bias, which we have recognized as a potential cause of equal protection violations.  Long, 485 Mass. at 734.  See, e.g., Bonds v. Superior Court, 99 Cal. App. 5th 821, 829 (2024) ("If [a] portion of [a] community is disproportionately populated by persons of a particular race, a detention could be the product of implicit bias even if the officer initiating the stop did not 'know' the race of [the] person being detained").  In this case, there is evidence suggesting that the gang unit focused its social media monitoring efforts on "nonwhite" users.  In light of that evidence, the fact that officers could not initially identify the race of every targeted individual does not preclude the reasonable inference that Krug's monitoring of the defendant's Snapchat account was motivated at least in part by race.
            In sum, the defendant has met his initial burden of "produc[ing] evidence upon which a reasonable person could rely to infer that the officer discriminated on the basis of the defendant's race."  Long, 485 Mass. at 723-724.  However, an equal protection violation will not be established unless the Commonwealth fails to "rebut the reasonable inference that the [enforcement conduct] was motivated at least in part by race."  Id. at 726.  Accordingly, it is now the Commonwealth's burden to rebut the defendant's initial inference of selective enforcement by "establishing a race-neutral reason" for monitoring the defendant.  Robinson-Van Rader, 492 Mass. at 17.  See id. at 22 (pedestrian stop was supported by race-neutral reason where defendant and his companion matched physical description of persons fleeing recent nearby shooting).
            b.  The Second Amendment claim.  We now address the defendant's argument that certain firearms charges should have been dismissed because the resident firearm licensing scheme then in effect facially violated the Second Amendment right to keep and bear arms.  First, we briefly review the relevant statutory framework and language.  We then discuss the standards applicable to facial challenges in general, as well as the substantive standard applicable to Second Amendment challenges - namely, the "historical tradition" test articulated in Bruen, 597 U.S. at 17.  We conclude that the Commonwealth's resident firearm licensing scheme under which the defendant was charged was not facially unconstitutional under Bruen, because at least some of its applications –- in particular, to felons and persons convicted of violent crimes –- were constitutionally valid.
            Unlicensed possession of a firearm was and still is prohibited in the Commonwealth.  See, e.g., Commonwealth v. Guardado, 491 Mass. 666, 690, S.C., 493 Mass. 1 (2023), cert. denied, 144 S. Ct. 2683 (2024) ("the absence of a license is an essential element of the offense of unlawful possession of a firearm").  General Laws c. 269, § 10 (a) (2), provides, in relevant part, that it is a criminal offense to knowingly possess a firearm outside of one's residence or place of business without "having in effect a license to carry firearms issued under [G. L. c. 140, § 131]."  In turn, G. L. c. 140, § 131 (d), provides the conditions under which such licenses are to be issued to residents of the Commonwealth.  The version of § 131 (d) effective at the time of the defendant's offense stated:
"Any person residing or having a place of business within the jurisdiction of the licensing authority . . . may submit to the licensing authority or the colonel of state police, an application for a Class A license to carry firearms, or renewal of the same, which the licensing authority or the colonel may issue if it appears that the applicant is not a prohibited person, as set forth in this section, to be issued a license and has good reason to fear injury to the applicant or the applicant's property or for any other reason, including the carrying of firearms for use in sport or target practice only, subject to the restrictions expressed or authorized under this section."
G. L. c. 140, § 131 (d), as amended through St. 2018, c. 123, §§ 11, 12.  The Commonwealth's resident firearm licensing scheme challenged by the defendant consisted of the joint operation of (1) the criminalization of unlicensed possession by Commonwealth residents pursuant to G. L. c. 269, § 10 (a) (2), with (2) the conditions under which resident licenses were to be issued pursuant to G. L. c. 140, § 131 (d).
            In challenging the constitutional validity of the Commonwealth's resident firearm licensing scheme, the defendant is limited to bringing a facial challenge.  It is uncontested that the defendant did not apply for a firearms license.  And "[t]his court has long held that standing to bring an as-applied challenge to the Commonwealth's firearm licensing scheme requires having applied for (and been denied) a license or [FID] card pursuant to that scheme."  Commonwealth v. Marquis, 495 Mass. 434, 439 (2025), petition for cert. filed, U.S. Supreme Ct., No. 25-5280 (July 31, 2025).  Nevertheless, "in a prosecution for violation of a licensing statute which is unconstitutional on its face, the issue of its validity is presented even in the absence of an application for a license."  Commonwealth v. Gordon, 354 Mass. 722, 725 (1968).  Hence, although the defendant does not have standing to bring an as-applied challenge to the Commonwealth's resident firearm licensing scheme, he does have standing to bring a facial challenge.  To succeed on this facial challenge, the defendant must "establish that no set of circumstances exists under which [the Commonwealth's resident firearm licensing scheme] would be valid" (citation omitted).  United States v. Rahimi, 602 U.S. 680, 693 (2024).  Conversely, for the Commonwealth to prevail, it "need only demonstrate" that the challenged licensing scheme is constitutional "in some of its applications."  Id.
            The substantive standard for evaluating the facial validity of the Commonwealth's resident firearm licensing scheme is laid out in Bruen, 597 U.S. at 17.  Briefly, Bruen concerned a Second Amendment challenge to the State of New York's licensing regime under which carrying a firearm outside of one's home or place of business required obtaining an "unrestricted license."  Id. at 12.  This in turn required making a showing of "proper cause" (citation omitted).  Id.  Although "proper cause" was not a statutorily defined term of art, New York courts had construed it to mean "a special need for self-protection distinguishable from that of the general community" (citation omitted).  Id.  This "proper cause" requirement proved fatal to the constitutional validity of New York's licensing regime.  As the Court held, "Because the State of New York issues public-carry licenses only when an applicant demonstrates a special need for self-defense, we conclude that the State's licensing regime violates the Constitution."  Id. at 11.  The Court reasoned in part that New York's law embodied a "may issue" licensing regime, "under which authorities have discretion to deny concealed-carry licenses even when the applicant satisfies the statutory criteria, usually because the applicant has not demonstrated cause or suitability for the relevant license."  Id. at 14-15.  The foundation of the Court's rejection of discretionary licensing regimes was its newly established "historical tradition" test.  Id. at 17.  Under this test, if "the Second Amendment's plain text covers an individual's conduct," then "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."  Id.  Otherwise, the regulation violates the Second Amendment right to keep and bear arms.  Id. at 24.
            Applying these premises to the defendant's facial challenge, we note one central application of the Commonwealth's resident firearm licensing scheme:  to "prohibited person[s]."  Specifically, by providing that the licensing authority "may issue [a license] if it appears that the applicant is not a prohibited person," the Commonwealth's resident licensing scheme excluded "prohibited person[s]" from receiving a license.  G. L. c. 140, § 131 (d).  Of particular relevance, the class of "prohibited" persons included those convicted of either a felony, G. L. c. 140, § 131 (d) (i) (A), or "a violent crime," G. L. c. 140, § 131 (d) (i) (C).  So, one application of the Commonwealth's resident firearm licensing scheme was the exclusion of felons and violent criminals from firearm possession.
            Furthermore, felons and violent criminals may be excluded from firearm possession consistent with the Second Amendment.  As a general matter, "the Second Amendment permits the disarmament of individuals who pose a credible threat to the physical safety of others."  Rahimi, 602 U.S. at 693.  In light of Rahimi, United States Courts of Appeals have repeatedly upheld the Federal prohibition on firearm possession by felons under 18 U.S.C. § 922(g)(1).  See United States v. Duarte, 137 F.4th 743, 761 (9th Cir. 2025) ("§ 922[g][1]'s permanent and categorical disarmament of felons is consistent with this Nation's historical tradition of firearm regulations"); Vincent v. Bondi, 127 F.4th 1263, 1265 (10th Cir. 2025), petition for cert. filed, U.S. Supreme Ct., No. 24-1155 (May 8, 2025) ("felon dispossession laws are presumptively valid. . . .  This presumption was reaffirmed in Rahimi"); United States v. Hunt, 123 F.4th 697, 708 (4th Cir. 2024), cert. denied, 145 S. Ct. 2756 (2025) (felon dispossession laws "accord[] with historical tradition regulating non-law-abiding persons and [are] consistent with the Supreme Court's repeated instruction that longstanding prohibitions on the possession of firearms by felons and the mentally ill, are presumptively lawful" [quotations and citation omitted]); United States v. Williams, 113 F.4th 637, 657 (6th Cir. 2024) ("our nation's history and tradition demonstrate that Congress may disarm individuals they believe are dangerous.  Section 922[g][1] is an attempt to do just that"); United States v. Jackson, 110 F.4th 1120, 1129 (8th Cir. 2024) ("Whether those [firearm disqualification laws] are best characterized as restrictions on persons who deviated from legal norms or persons who presented an unacceptable risk of dangerousness, Congress acted within the historical tradition when it enacted § 922[g][1] and the prohibition on possession of firearms by felons").  And even when courts have departed from this consensus on the validity of categorically excluding felons from firearm possession, they have accepted the validity of disarming violent criminals.  See Range v. Attorney Gen. U.S.A., 124 F.4th 218, 229-230 (3d Cir. 2024) (noting that earlier felony disqualification statute "applied only to violent criminals" and rejecting application of § 922[g][1] to defendant convicted of food-stamp fraud on ground that government "has [produced] no evidence . . . that food-stamp fraud is closely associated with physical danger").
            In short, the prohibition on firearm possession by felons or violent criminals embodied in § 10 (a) (2) and § 131 (d) (i) is consistent with the Second Amendment.  Whatever else may be said about the Commonwealth's resident firearm licensing scheme under which the defendant was charged, at least "some of its applications" were constitutional.  Rahimi, 602 U.S. at 693.  Because a facial challenge succeeds only if the defendant "establish[es] that no set of circumstances exists under which [the challenged scheme] would be valid" (citation omitted), id., the defendant's facial challenge to the Commonwealth's resident firearm licensing scheme fails.[8]
            3.  Conclusion.  The defendant successfully raised a reasonable inference of selective enforcement in violation of his equal protection rights.  We therefore vacate the order denying his motion to suppress and remand that matter to the District Court for a further evidentiary hearing pursuant to Long, 485 Mass. at 724, at which the Commonwealth will have the burden of rebutting that reasonable inference.  However, the defendant did not succeed in his facial challenge to the Commonwealth's resident firearm licensing scheme.  Therefore, we affirm the order denying the motion to dismiss.
So ordered.
 
footnotes

 
            1 We acknowledge the amicus briefs submitted in support of the defendant by the Innocence Project, the Center on Privacy and Technology, and Isadora Borges Monroy; and by the Massachusetts Association of Criminal Defense Lawyers and the Criminal Justice Institute at Harvard Law School.
            2 Bitmojis "function as user profile pictures on Snapchat" in lieu of actual photographs of the users.  Commonwealth v. Dilworth, 494 Mass. 579, 581 n.2 (2024).
            3 The Lowell police department did not disclose the specific username or bitmoji used in Krug's undercover Snapchat account.  However, at the motion to suppress hearing, the prosecutor did disclose that the bitmoji and username were both identified as being nonwhite.
            4 Two additional counts –- possession of a firearm without an FID card and receipt of stolen property –- were dismissed on January 30, 2024, at the request of the Commonwealth.
            5 The judge exempted from production any police reports or investigatory notes concerning murder, human trafficking, or sexual assault investigations.
            6 That is, the second judge predicated his denial of the defendant's motion to suppress on the defendant's failure to meet his burden at step one of the selective enforcement inquiry articulated in Long, 485 Mass. at 724-725.  In a footnote, the judge also stated that "for the reasons set forth herein, this Court concludes [th]at the evidence at the hearing in this case established that . . . Krug's investigation of the defendant was not motivated by race."  However, the judge did not find (or mention) any "race-neutral reason," Commonwealth v. Robinson-Van Rader, 492 Mass. 1, 17 (2023), proffered by the Commonwealth for Krug's enforcement conduct -- let alone articulate an express determination as to the credibility of any such reason.  Because step two of Long's burden-shifting framework requires conducting precisely that analysis, see id., the judge's comments in the footnote do not support a conclusion in favor of the Commonwealth on the ultimate question whether the Commonwealth has successfully rebutted the inference of selective enforcement established at step one.  Instead, the judge's comments appear directed to the defendant's burden at the first step of Long.
            7 As discussed in note 3, supra, the Lowell police department did not disclose the specific username or bitmoji used in Krug's undercover Snapchat account.  Nor did it disclose any particular race or ethnicity associated with the username or bitmoji.  It did, however, disclose that the bitmoji and username were "nonwhite."
            8 In an earlier decision, we held that a former version of the Commonwealth's firearm licensing scheme for nonresidents was facially violative of the Second Amendment in light of Bruen.  See Commonwealth v. Donnell, 495 Mass. 471, 479-483 (2025).  That decision was premised on the conclusion that the constitutionally infirm portions of the Commonwealth's nonresident firearm licensing scheme were not capable of severance.  Id. at 481-483.  In drawing that conclusion, we distinguished the relevant statutory language from the language at issue in State v. Wade, 476 N.J. Super. 490 (App. Div. 2023), where the court found that the constitutional infirmity in New Jersey's firearm licensing scheme was in fact capable of severance.  See id. at 511.  See also People v. Bey, 108 Cal. App. 5th 144, 166-167 (2025) (severing "good cause" requirement from rest of licensing scheme); People v. Williams, 76 Misc. 3d 925, 928 (N.Y. Sup. Ct. 2022) (severing "proper cause" requirement from rest of licensing scheme).  However, our threshold conclusion that the Commonwealth's nonresident firearm licensing scheme was facially unconstitutional did not take into account the proviso that "no license shall be issued to a person who" has been convicted of a "felony" or a "violent crime."  G. L. c. 140, § 131F (i), as amended through St. 2014, c. 284, §§ 60, 63.  To the extent that this omission is called into question by today's opinion, Donnell is hereby abrogated.