# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 21, 2025

Lyle W. Cayce
Clerk

———————

No. 24-60607

———————

United States of America,

*Plaintiff—Appellee*,

*versus*

Kevin LaMarcus Mitchell,

*Defendant—Appellant*.

———————————————————

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 1:23-CR-154-1

———————————————————

Before Elrod, *Chief Judge*, and Clement and Haynes, *Circuit Judges*.
Edith Brown Clement, *Circuit Judge*:

This case is about whether the Second Amendment protects a habitual marijuana user from being permanently dispossessed of a firearm based on our Nation's historical tradition of firearm regulation. On November 28, 2023, Kevin LaMarcus Mitchell was charged with possession of a firearm as a felon in violation of 18 U.S.C. § 922(g)(1) based on his prior conviction under 18 U.S.C. § 922(g)(3) for unlawful possession of a controlled substance while possessing a firearm. He moved to dismiss the indictment, raising several constitutional challenges to § 922(g)(1), including one under the Second Amendment and *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597

No. 24-60607

U.S. 1 (2022). The district court denied his motion, and Mitchell pleaded guilty and was sentenced. On appeal, he brings five separate constitutional challenges. Because Mitchell's § 922(g)(1) conviction is unconstitutional as applied to him, we REVERSE the district court's denial of his motion to dismiss and VACATE the judgment of conviction and sentence.

I

Mitchell has an extensive criminal history that began after he turned 18. He also was convicted for felony possession of a firearm by an unlawful user of a controlled substance under § 922(g)(3). Mitchell's § 922(g)(3) offense forms the predicate offense for his § 922(g)(1) offense, which bars convicted felons from possessing firearms. Each offense is addressed in turn.

A

On April 6, 2018, at the age of nineteen, Mitchell was arrested for outstanding warrants by the Pascagoula Police Department. A search of the vehicle in which he was arrested revealed a loaded .40 caliber pistol and a small bag of marijuana. Mitchell admitted to being a drug user but denied ownership of the drugs and the firearm recovered in the vehicle. He later admitted over a recorded jail call that the firearm, which had been reported as stolen, was in his possession. Based on these admissions, Mitchell pleaded guilty to possessing a firearm as an unlawful user in violation of § 922(g)(3), a felony offense. He was sentenced to twenty-one months of imprisonment, followed by three years of supervised release.

At the time of his § 922(g)(3) offense, Mitchell admitted to smoking three marijuana cigarettes per day.[1] His Presentence Investigation Report

---

[1] We take judicial notice of Mitchell's § 922(g)(3) case information. *See In re Deepwater Horizon*, 934 F.3d 434, 440 (5th Cir. 2019).

No. 24-60607

("PSR") in that case noted that he "admitted to being a drug user, stating that he has used marijuana the past three years." He later tested positive for marijuana while on supervised release in March 2022.

Following his release from prison for his § 922(g)(3) offense, Mitchell engaged in a series of domestic violence acts and other criminal conduct. Yet none of these acts culminated in a felony charge against him.

B

On November 27, 2023, Mitchell was arrested by a Federal Bureau of Investigation ("FBI") task force on an outstanding warrant for unrelated charges of auto theft and flight from an officer charged by the Moss Point, Mississippi, Police Department. When executing that warrant, agents found a 9-millimeter handgun and a 9-millimeter Berretta in the room Mitchell occupied. On November 28, 2023, a criminal complaint was filed by the government in the United States District Court for the Southern District of Mississippi against Mitchell for violating § 922(g)(1)'s bar on being a felon in possession of a firearm. The predicate offense was his § 922(g)(3) conviction.

At the time of his § 922(g)(1) offense, Mitchell admitted to smoking marijuana daily. While on supervised release, Mitchell tested positive for marijuana on two occasions. In his initial appearance in this case, he also submitted a urine sample that tested presumptive positive for marijuana.

Before trial, Mitchell moved to dismiss the indictment, raising several constitutional challenges. The government opposed the motion. The district court denied his motion in April 2024.

Mitchell pleaded guilty subject to a conditional plea agreement. He reserved the right to appeal the district court's denial of his motion to dismiss the indictment on Second Amendment grounds. The district court sentenced

3

Mitchell to sixty-four months of imprisonment, to be followed by a three-year term of supervised release. Mitchell timely appealed.

## II

On appeal, we review a district court's denial of a motion to dismiss an indictment de novo. *United States v. Kay*, 513 F.3d 432, 440 (5th Cir. 2007). We also review preserved constitutional challenges de novo. *United States v. Branson*, 139 F.4th 475, 477 (5th Cir. 2025). If the constitutional challenge was not raised below, we will review it for plain error. *Id.* "Plain error exists if (1) there is an error, (2) the error is plain, (3) the error affects substantial rights, and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Howard*, 766 F.3d 414, 419 (5th Cir. 2014) (cleaned up). An error is not plain if it is subject to reasonable debate. *Puckett v. United States*, 556 U.S. 129, 135 (2009).

## III

Mitchell raises five challenges to the district court's denial of his motion to dismiss, arguing that § 922(g)(1) is unconstitutional because it (1) violates the Second Amendment as applied to him, (2) facially violates the Second Amendment, (3) is vague, (4) exceeds Congress's authority under the Commerce Clause, and (5) violates the Equal Protection Clause. The central legal question before us today is whether § 922(g)(1) is unconstitutional as applied to Mitchell's § 922(g)(3) predicate offense.

### A

Before we assess the merits of his Second Amendment as-applied challenge, we must first arm ourselves with the proper standard of review.

To begin, we acknowledge that the "distinction between as-applied and facial challenges is sometimes hazy." *United States v. Perez*, 43 F.4th 437, 443 (5th Cir. 2022). For us, the nature of the question frames our inquiry:

"An as-applied challenge asks whether a law—though constitutional in some circumstances—'is nonetheless unconstitutional as applied to [a defendant's] activity.'" *United States v. Morgan*, 147 F.4th 522, 526 (5th Cir. 2025), *reh'g en banc denied*, No. 24-30561 (5th Cir. Oct. 20, 2025) (alteration in original) (quoting *Spence v. Washington*, 418 U.S. 405, 414 (1974) (per curiam)). A facial challenge, on the other hand, asks whether "the law is unconstitutional in all of its applications." *Id.* (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)). Though there is no bright-line rule "for determining whether a matter was raised below," to preserve a challenge on appeal, the party intending to do so "must press and not merely intimate the argument during the proceedings before the district court." *United States v. Hearns*, 845 F.3d 641, 648 (5th Cir. 2017).

For as-applied challenges to § 922(g)(1), we have found them preserved in cases where the defendant simply referenced an "as-applied" challenge in his motion to dismiss, and the district court, in turn, analyzed it. In *United States v. Zinnerman*, for example, we held that a defendant preserved his as-applied challenge because he insisted in his motion to dismiss that § 922(g)(1) was unconstitutional "as applied to [him]," and the district court analyzed it. No. 24-30310, 2025 WL 984605, at *2 (5th Cir. Apr. 2, 2025) (per curiam), *cert. denied*, No. 25-5090, 2025 WL 2824238 (U.S. Oct. 6, 2025). We have since embraced *Zinnerman* with open arms in recent decisions to find preservation of as-applied challenges to § 922(g)(1). *See, e.g., United States v. Reyes*, 141 F.4th 682, 685–86 (5th Cir. 2025) (per curiam) (concluding defendant preserved his as-applied challenge in his motion to dismiss by "[a]rguing that § 922(g)(1) is unconstitutional both 'as applied' to him and on its face," and the district court stated that *Bruen* did not render § 922(g)(1) unconstitutional); *Morgan*, 147 F.4th at 526–27 (finding that, while "a close call," defendant preserved his challenge because

he "explicitly stated in his district court filings that § 922(g)(1) was unconstitutional 'as-applied,'" and "the district court recognized" it).

In his motion to dismiss, Mitchell explicitly asserted that § 922(g)(1) "violates the Second Amendment . . . and is unconstitutional *as applied to him*" under controlling precedent. *See Reyes*, 141 F.4th at 685; *Morgan*, 147 F.4th at 526. He developed this theory in greater detail in his memorandum in support of dismissal. The district court, too, explicitly acknowledged Mitchell's "as-applied" challenge in its order denying his motion to dismiss. *See Morgan*, 147 F.4th at 526 (noting "the district court's order . . . referenced [Morgan's] 'as-applied' challenge").

The district court, by all measures and accounts, engaged in a cursory treatment of Mitchell's Second Amendment challenge under *Bruen*—one that neither identified nor analyzed the operation and effect of his § 922(g)(3) predicate offense. Of course, the district court's lack of discussion could highlight concerns about whether Mitchell raised sufficient arguments to preserve his as-applied challenge on appeal. *See Int'l Women's Day March Plan. Comm. v. City of San Antonio*, 619 F.3d 346, 356 (5th Cir. 2010) (finding only a facial challenge preserved where the record was bereft "of any explicit reference to an as-applied challenge"). But those concerns are mitigated in this case because Mitchell and the district court each acknowledged that Mitchell was pressing a Second Amendment as-applied challenge to § 922(g)(1). We find such explicit nods enough to preserve Mitchell's as-applied challenge on appeal. *See Morgan*, 147 F.4th at 526.

Moreover, unlike *Morgan* and *Reyes*, where the government contested that the defendant did not preserve his as-applied challenge, the government did not mount such a challenge against Mitchell. *Cf. Morgan*, 147 F.4th at 526–27; *Reyes*, 141 F.4th at 685–86 n.7. In fact, the government seemingly agreed that Mitchell preserved an as-applied challenge to § 922(g)(1) in its

response brief before it walked away from that position after oral argument. Of course, this court, "not the parties, determine[s] [its] standard of review." *United States v. Rosenthal*, 805 F.3d 523, 528 (5th Cir. 2015). But the government's position is a salient factor. Agreement, though not dispositive, is a helpful clue to us.

For these reasons, we first hold that Mitchell preserved his as-applied challenge to § 922(g)(1), *see United States v. Penn*, 969 F.3d 450, 459 (5th Cir. 2020), and therefore de novo review applies, *Branson*, 139 F.4th at 477.

B

Next, we turn to Mitchell's Second Amendment as-applied challenge. His main argument on appeal is that the government failed to proffer relevantly similar historical analogues to justify permanent disarmament under § 922(g)(1) as applied to Mitchell's § 922(g)(3) predicate offense. The government, by contrast, focuses on Mitchell's overall purported dangerousness and history of recidivism to justify his firearm dispossession.

We begin, as always, with the constitutional text. The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear arms, shall not be infringed." U.S. Const. amend. II. As part of our constitutional system, "the right to keep and bear arms is among the 'fundamental rights necessary to our system of ordered liberty.'" *United States v. Rahimi*, 602 U.S. 680, 690 (2024) (quoting *McDonald v. Chicago*, 561 U.S. 742, 778 (2010)). Though the right to bear arms is vital to ordered liberty, this right is not "unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). Because it "codified a pre-existing right, . . . pre-existing limits on that right are part and parcel of it." *Rahimi*, 602 U.S. at 737 (Barrett, J., concurring).

Supreme Court and Fifth Circuit precedent fashion a two-step method for evaluating Second Amendment challenges. *Bruen*, 597 U.S. at 17;

*United States v. Diaz*, 116 F.4th 458, 466–67 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 2822 (2025). *First*, does the "plain text" of the Second Amendment cover an individual's conduct? *Bruen*, 597 U.S. at 17. If yes, "the Constitution presumptively protects that conduct," and we move to the next step in the analysis. *Id. Second*, is the regulation "consistent with this Nation's historical tradition of firearm regulation" such that its application is constitutionally justified? *Id.* If the regulation comports with our Nation's historical tradition, "a court [can] conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

Essential to Step Two are two "central" sub-questions: "why" and "how" a regulation burdens the right. *Id.* at 29 (emphasis omitted). The "why" teaches that "if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Rahimi*, 602 U.S. at 692. The "how," by contrast, carefully signals that "a law . . . may not be compatible with the right if it [regulates arms-bearing] . . . beyond what was done at the founding," "[e]ven when a law regulates arms-bearing for a permissible reason." *Id.*

The government bears the heavy burden to show that the challenged law is "'relevantly similar' to laws that our tradition is understood to permit." *Id.* (quoting *Bruen*, 597 U.S. at 29). As part of that obligation, the government must locate and expand upon "historical precursors," *id.*, and "well-established and representative historical *analogue*[*s*]," *Bruen*, 597 U.S. at 30, to justify the challenged law's constitutionality. Because this test requires digging into our Nation's history and tradition of firearm regulation, courts must rely on a mix of "analogical reasoning and sound judgment" to determine whether a "conceptual fit exists between the old law and the new." *United States v. Connelly*, 117 F.4th 269, 274 (5th Cir. 2024). The

government need not put forth a "dead ringer" or "historical *twin*" for a challenged law "to pass constitutional muster," *Bruen*, 597 U.S. at 30 (emphasis in original)—because, as we know well from the Supreme Court's recent guidance, "a law [is not] trapped in amber," *Rahimi*, 602 U.S. at 691.

In the Second Amendment context, the text and history principle, which underpins *Bruen*'s test, traces its origins to *Heller*, where Justice Scalia, writing for the Court, employed a "textual analysis" to discover and unlock the "normal and ordinary . . . meaning" of the Second Amendment. *Heller*, 554 U.S. at 576, 578. The Court in *Heller* reviewed the District of Columbia's ban on the possession of handguns. *Id.* at 574–75. "Putting all of these textual elements together," to derive the original meaning of the Second Amendment, the Court indicated that the Amendment's operative clause—"the right of the people to keep and bear Arms . . . shall not be infringed"—"guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Id.* at 592. The Court also canvassed the history, which "confirmed" its textual conclusions about the core of the right, *id.*, as well as its limit, *id.* at 626–28. What the text said, history confirmed.

With text and history in hand, *Bruen* imported *Heller*'s method into its formulated test and applied it to New York's proper-cause requirement for carrying a handgun. There, the Court held "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home" and reviewed the degree to which New York's public-carry licensing regime burdened that right by issuing licenses "only when an applicant demonstrate[d] a special need for self-defense." 597 U.S. at 10–11. Thus, *Bruen* concluded that the government did not "identify an American tradition justifying the State's proper-cause requirement." *Id.* at 70.

Next, in *Rahimi*, the Court reviewed a facial challenge to § 922(g)(8), which prohibits an individual subject to a domestic violence restraining order

No. 24-60607

from possessing a firearm. 602 U.S. at 684–86. After reviewing the historical tradition of surety and "going armed" laws, the Court held that, if "an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed" under the Second Amendment. *Id.* at 698.

Since *Bruen*, the Supreme Court has not yet addressed how its test interacts with § 922(g)(1) challenges. An entrenched circuit split has now emerged about its proper application. The Fourth, Eighth, Ninth, Tenth, and Eleventh Circuits, for example, have upheld the *categorical* application of § 922(g)(1) to *all* felons. *E.g.*, *United States v. Jackson*, 110 F.4th 1120, 1129 (8th Cir. 2024) (concluding that "legislatures traditionally employed status-based restrictions to disqualify categories of persons from possessing firearms," so "Congress acted within the historical tradition when it enacted § 922(g)(1) and the prohibition on possession of firearms by felons"), *cert. denied*, 145 S. Ct. 2708 (2025).[2] In contrast, the Fifth Circuit, along with the First, Second, Third, Sixth, and Seventh Circuits, has concluded that § 922(g)(1) *might* be unconstitutional as applied to *some* felons. *E.g., Diaz*, 116 F.4th at 458 (rejecting an as-applied challenge because the defendant's underlying felony was relevantly similar to a death-eligible felony at the Founding).[3] At this juncture, we are bound by *Diaz*.

-----

[2] *See also United States v. Hunt*, 123 F.4th 697, 707–08 (4th Cir. 2024) (rejecting an as-applied challenge on a categorical basis); *United States v. Duarte*, 137 F.4th 743, 748 (9th Cir. 2025) (en banc) ("Today, we . . . hold that § 922(g)(1) is not unconstitutional as applied to non-violent felons."); *Vincent v. Bondi*, 127 F.4th 1263, 1265–66 (10th Cir. 2025) (rejecting an as-applied challenge because neither *Bruen* nor *Rahimi* abrogated circuit precedent foreclosing such a challenge); *United States v. Dubois*, 94 F.4th 1284, 1293 (11th Cir. 2024) (holding that *Bruen* did not abrogate circuit precedent foreclosing such challenges), *cert. granted, judgment vacated*, 145 S. Ct. 1041 (2025).

[3] *See also United States v. Langston*, 110 F.4th 408, 419–20 (1st Cir. 2024) (rejecting an as-applied challenge because there was no "plain" error); *United States v. Caves*, No. 23-6176, 2024 WL 5220649, at *1 (2d Cir. Dec. 26, 2024) (same); *Range v. Att'y Gen.*, 124 F.4th 218, 222–23 (3d Cir. 2024) (en banc) (holding that § 922(g)(1) is unconstitutional as

No. 24-60607

In *Diaz*, this court reviewed a facial and as-applied challenge to § 922(g)(1). There, Diaz had an extensive criminal history, but the court noted that, for purposes of analyzing his "predicate offenses under § 922(g)(1)," it could consider only "prior convictions that are 'punishable by imprisonment for a term exceeding one year.'" *Id.* at 467 (quoting § 922(g)(1)). Diaz's relevant history included his felonies: vehicle theft, evading arrest, and possessing a firearm as a felon. *Id.* His additional criminal history, including charges for possession of a controlled substance that were later dismissed, as well as his misdemeanor conviction for possession of less than two ounces of marijuana, were "not relevant" to the analysis. *Id.*

In arguing for the existence of a historical tradition of permanent disarmament of felons, the government identified two categories of regulations: (1) laws authorizing capital punishment and estate forfeiture as penalties for felonies and (2) laws targeting the crime of theft, which was a felony at the Founding and was punished accordingly. *Id.* at 467–68. After reviewing these analogues, the court held that, while the plain text of the Second Amendment covered Diaz's conduct prohibited by § 922(g)(1), disarming a person with Diaz's criminal history of theft was consistent with the Nation's historical tradition of firearm regulation. *Id.* at 466–72. "[I]f capital punishment was permissible to respond to theft," the court reasoned, "then the lesser restriction of permanent disarmament that § 922(g)(1) imposes is also permissible." *Id.* at 469. *Diaz* also recognized that it did "not

---

applied to a felon who was convicted of making a false statement to secure food stamps); *United States v. Williams*, 113 F.4th 637, 661–62 (6th Cir. 2024) (rejecting an as-applied challenge because the defendant's criminal record showed that he was sufficiently dangerous to justify disarmament); *United States v. Gay*, 98 F.4th 843, 846–47 (7th Cir. 2024) (assuming without deciding that an as-applied challenge could generally proceed but rejecting the defendant's specific challenge because his prior felonies encompassed aggravated battery of a peace officer and possession of a weapon while in prison).

foreclose future as-applied challenges by defendants with different predicate convictions." *Id.* at 470 n.4. Moreover, because § 922(g)(1) was constitutional as applied, his facial challenge necessarily failed. *Id.* at 471–72.

The upshot of *Diaz* for our circuit precedent was twofold. *First*, it defined the relevant scope of inquiry for an as-applied challenge to § 922(g)(1): a court may consider only crimes punishable by a term of imprisonment exceeding one year for predicate offenses. *Second*, it left the door open for § 922(g)(1) to be unconstitutional as applied to some felons.

1

With this general framework established, we turn now to our circuit precedent for as-applied challenges to § 922(g)(3) and § 922(g)(1). We first survey our developing precedent for as-applied challenges to § 922(g)(3) offenses. Two cases are instructive for us. Each are addressed in turn.

In *Connelly*, this court reviewed a facial and as-applied challenge to § 922(g)(3) by Connelly, who was a non-violent, marijuana-smoking gunowner. 117 F.4th at 272. There, the El Paso police went to Connelly's home in response to a "shots fired" call, and they found her husband at the neighbor's door firing a shotgun. *Id.* Police arrested him and spoke to Connelly, who suggested that "she would at times smoke marijuana as a sleep aid and for anxiety." *Id.* After police conducted a sweep of Connelly's home and recovered drug paraphernalia and firearms, including firearms owned by Connelly, she was charged with violating § 922(g)(3). *Id.* There was no evidence she was intoxicated at the time of her offenses. *Id.*

Connelly moved to dismiss her charges on facial and as-applied grounds, and the district court granted her motion. *Id.* On appeal, the government identified three "buckets" of historical analogues to justify § 922(g)(3)'s constitutionality as applied to her: (1) laws disarming the

mentally ill, (2) laws disarming dangerous individuals, and (3) intoxication laws. *Id.* at 274–75. The court considered and rejected each in turn. *Id.* at 275.

*Connelly* first held that our history and tradition surrounding laws disarming the mentally ill did not address a problem comparable to § 922(g)(3) because habitual marijuana users, like Connelly, were not "permanently impaired in a way comparable to severe mental illness." *Id.* at 275, 277. It next held that our history and tradition did not support finding that Connelly, a non-violent marijuana user, was "dangerous" to justify disarmament, as the evidence did not show that the "Founders authorized Congress to disarm *anyone* it deemed dangerous." *Id.* at 277 (emphasis in original). Rather, the analogues were "based in part on concerns for public safety," that were linked with political and religious motivations. *Id.* at 278.

Finally, the court concluded that, while our Nation's history and tradition surrounding intoxication laws addressed a comparable problem to § 922(g)(3), "they do not impose a comparable burden on the right holder." *Id.* at 281. In other words, they shared the same "why" but not the same "how." *Id.* At most, the court concluded, our history and tradition support "a ban on carrying firearms while an individual is *presently* under the influence." *Id.* at 282 (emphasis in original). Applied to Connelly, since there was no evidence that she was intoxicated during her § 922(g)(3) offense, regulating her "habitual or occasional drug use" would "impose[] a far greater burden on her Second Amendment rights than our history and tradition of firearms regulation can support." *Id.* We also found § 922(g)(3)'s language—"unlawful user"—acutely problematic because "there is a substantial difference between an actively intoxicated person and an 'unlawful user' under § 922(g)(3)." *Id.* "Stunningly," *Connelly* wrote, "an inference of 'current use' can be drawn even from 'a conviction for use or possession of a controlled substance within the past year.'" *Id.* (quoting 27 C.F.R. § 478.11). At bottom, *Connelly* concluded that *Bruen*'s mandate to

deploy "analogical reasoning" from our historical tradition could not "stretch that far." *Id.* We affirmed the dismissal of Connelly's as-applied challenge and reversed as to her facial challenge because there are scenarios where § 922(g)(3) could be constitutionally applied in a case, such as banning presently intoxicated persons from carrying firearms. *Id.* at 282–83.

*Connelly* illustrates two general principles in this area of law. *First*, § 922(g)(3) is not facially unconstitutional because our Nation's historical tradition supports firearm regulations disarming presently intoxicated individuals. *Id.* at 282. *Second*, § 922(g)(3) is unconstitutional when used to disarm an individual solely "based on habitual or occasional drug use." *Id.*

In *United States v. Daniels*, this court embraced *Connelly* as "largely" controlling of its outcome. 124 F.4th 967, 971 (5th Cir. 2025), *petition for cert. filed*, No. 24-1248 (U.S. June 5, 2025). There, a jury found Daniels to be an "unlawful user" in violation of § 922(g)(3). *Id.* at 970. But when placed side by side, *Daniels* presented "a closer case" than *Connelly*. *Id.* at 975. Daniels "went to trial," where the facts suggested that he "was often intoxicated while transporting weapons." *Id.* at 975. At trial, Daniels admitted to using marijuana "roughly half the days of each month," and he was twice spotted "with guns" and marijuana "in his truck." *Id.* In fact, at the time of his offense, the marijuana in his truck was "burnt," *i.e.*, "used," and "he had a loaded handgun within arm's length and a loaded rifle in the back seat." *Id.*

Unlike Connelly, who admitted to occasional marijuana use before bed, Daniels seemingly drove "around town while intoxicated with loaded guns in his car." *Id.* Yet the jury instructions stated that to find that Daniels was an "unlawful user," the jury did not need to find "that he used the controlled substance at the precise time he possessed the firearm" since "[s]uch use is not limited to the use of drugs on a particular day, or within a matter of days or weeks before." *Id.* (alteration in original). Rather, "the jury

was instructed that it need only find 'that the unlawful use has occurred recently enough to indicate that the individual is actively engaged in such conduct.'" *Id.* For this reason, the jury instruction "doom[ed] Daniel's conviction" because the jury "did not necessarily find that Daniels had even used marihuana 'within a matter of . . . weeks before' his arrest, but only that his use 'occurred recently enough' to indicate Daniels was 'actively engaged' in unlawful use." *Id.* (alteration in original). Since the jury did not find that Daniels was necessarily intoxicated at the time of his offense, we held that § 922(g)(3) was unconstitutional as applied to him. *Id.* at 975–76. Critically, what *Connelly* held about § 922(g)(3), *Daniels* reaffirmed: "disarming individuals solely for their prior, occasional, or habitual marihuana use does not" reflect our Nation's "history of firearm regulations." *Id.* at 979.

Along the way to its disposition, *Daniels* made "a few tentative observations gleaned from recent precedent" about whether § 922(g)(3) could be applied to defendants who were not presently intoxicated or under the influence of a controlled substance while possessing a firearm. *Id.* at 976.

*First*, our circuit has not embraced a "blanket analogy between all drug users and the mentally ill," but instead has suggested in dicta "that gun restrictions could be constitutionally applied to 'someone whose mental illness is so severe that she presents a danger to herself and others.'" *Id.* (quoting *Connelly*, 117 F.4th at 277). We have clarified that, if the government could show that a defendant's use of drugs "was so *frequent, severe, and impairing* as to render him analogous to the dangerously mentally ill, disarming him under § 922(g)(3) *might* find support in the historical tradition of confining and disarming mental patients." *Id.* (emphases added); *see also Connelly*, 117 F.4th at 277 (noting the government "might succeed if it were able to demonstrate that [the defendant]'s drug use was so regular and heavy that it rendered her continually impaired"). But that has not yet happened.

No. 24-60607

*Second*, our Nation's historical intoxication laws might also justify "some applications of § 922(g)(3)," but that would require "facts admitted by a defendant or proven at trial." *Daniels*, 124 F.4th at 976. *Daniels* suggested that the degree of "[s]pecificity in jury instructions will likely be crucial here," as "requiring jurors to find a tight temporal nexus between an individual's drug use and his possession of firearms could bring § 922(g)(3)'s application closer in line with historical laws targeting the presently intoxicated, the mentally ill, or those who pose a danger to others." *Id.*

In concurrence, Judge Higginson construed *Connelly* as adopting a contemporaneity rule—that a § 922(g)(3) conviction is constitutional when "the temporal nexus is one of contemporaneity—meaning the jury found that the defendant possessed a firearm while presently (that is, actively) using controlled substances unlawfully." *Id.* at 980 (Higginson, J., concurring). The majority rejected that bright-line rule, suggesting that it "relies on an unduly narrow reading of *Connelly* and an understandable but unwarranted aversion to letting Second Amendment doctrine develop more fully as more cases involving different fact patterns arise." *Id.* at 978. Instead, the majority emphasized that *Connelly* should be read more broadly for the following view: "'[t]he history and tradition *before us* support, at most, a ban on carrying firearms while an individual is presently under the influence.'" *Id.* at 977 (alteration and emphasis in original) (quoting *Connelly*, 117 F.4th at 282). *Daniels* concluded that a "piecemeal approach to laws such as § 922(g)(3), determining the contours of acceptable prosecutions through the resolution of continual as-applied challenges, is what *Bruen* and *Rahimi* require." *Id.* at 978; *see also* William Baude & Robert Leider, *The General-Law Right to Bear Arms*, 99 Notre Dame L. Rev. 1467, 1511 (2024) ("Exactly where in between to draw the line [in § 922(g)(1) cases] is something the courts are currently debating and would eventually resolve in common-law fashion.").

*Third*, if the government puts forth "historical laws disarming the mentally ill or the intoxicated," the analogies to § 922(g)(3) "will likely find stronger footing if the government can establish a connection between the defendant's active or regular drug use and violent or dangerous conduct." *Daniels*, 124 F.4th at 976. *Daniels* noted that, while the government's dangerousness analogues in *Connelly* failed, it addressed only two categories of laws and regulations: "laws barring political dissidents from owning guns during periods of conflict and laws disarming religious minorities." *Id.* at 976–77 (citing *Connelly*, 117 F.4th at 277–79). *Daniels* left open the possibility that, in a future case with different facts, "the government could attempt to establish that a defendant's frequent or recent drug use renders him presumptively dangerous because laws throughout our nation's history have aimed 'to keep guns out of the hands of presumptively risky people.'" *Id.* at 976 (quoting *United States v. Veasley*, 98 F.4th 906, 915–16 (8th Cir. 2025)).

Since *Connelly*, our court has considered the historical nexus between drug trafficking and dangerousness. In *United States v. Kimble*, for example, we held that § 922(g)(1) was constitutional as applied to Kimble, who had been convicted of two drug-trafficking felonies. 142 F.4th 308, 318 (5th Cir. 2025). These were deemed dangerous felonies. *Id. Kimble* recognized that the government's analogues were relevantly similar to the Nation's history and tradition of disarming those with past criminal conduct that "evinces a special danger of misusing firearms," so Kimble's conviction under § 922(g)(1) "accords with the Second Amendment because Congress can categorically disarm individuals convicted of violent felonies like drug trafficking." *Id.* at 314, 318. The court stressed the narrowness of its ruling and explained that its conclusion did "not depend on an individualized assessment that Kimble is dangerous." *Id.* at 318. *Kimble* did not "embrace the view that courts should look beyond a defendant's predicate conviction and assess whether the felon's history or characteristics make him likely to

misuse firearms." *Id.* (cleaned up). Instead, it reaffirmed *Diaz*: The key "consideration is a defendant's 'prior convictions that are punishable by imprisonment for a term exceeding one year,' not unproven conduct charged contemporaneously with a defendant's (g)(1) indictment or prior conduct that did not result in a felony conviction." *Id.* (quoting 116 F.4th at 467).

2

We turn next to our precedent for as-applied challenges to a § 922(g)(1) with a § 922(g)(3) predicate offense.

In *United States v. Contreras*, this court considered a facial and as-applied challenge to § 922(g)(1) where Contreras had one underlying predicate conviction: a § 922(g)(3) offense. 125 F.4th 725, 728–33 (5th Cir. 2025). In 2020, Contreras was twice caught possessing less than two ounces of marijuana, leading to two misdemeanor convictions. *Id.* at 727. The next year, he was sentenced in federal court to twenty-four months of imprisonment and three years of supervised release for being an unlawful user in possession of a firearm in violation of § 922(g)(3). *Id.* He began serving his term of supervised release for that offense in 2022, but a few months later, detectives began investigating his social media, where they saw he possessed a handgun in violation of his firearm prohibition. *Id.* at 727–28. By March 2023, detectives applied for a warrant, saw him commit a traffic violation, and upon stopping him for that violation, "smelled marijuana coming from the car." *Id.* at 728. They also smelled marijuana on his person, and they found "eight grams of marijuana, packaging, a scale, marijuana residue scattered throughout, and a loaded pink 9-millimeter Glock" in the vehicle. *Id.* Detectives arrested him, and the government indicted Contreras on one count of possession of a firearm by a convicted felon under § 922(g)(1). *Id.* He moved to dismiss, and the district court denied his motion. *Id.* Contreras entered into a conditional plea agreement, affirming

the government's factual basis but reserving the right to appeal the district court's denial of his motion to dismiss on Second Amendment grounds. *Id.* After accepting his conditional plea and being sentenced, he appealed. *Id.*

On appeal, this court rejected Contreras's facial challenge on arrival as foreclosed by circuit precedent, *id.* at 729, and rejected his as-applied challenge for two reasons. The first ground was that the Nation's history and tradition of firearm regulations sufficiently supported "banning presently intoxicated persons from carrying weapons," as *Connelly* had recognized in the context for § 922(g)(3). *Id.* at 731–32 (emphasis omitted) (quoting *Connelly*, 117 F.4th at 282). Applying the proper scope of inquiry under *Diaz*, *Contreras* reiterated that "the only pertinent offense" was Contreras's "user in possession of a firearm charge" under § 922(g)(3), which was his only felony "predicate offense" underpinning his § 922(g)(1) conviction. *Id.* at 730. Though his history included two additional offenses, they were "misdemeanor offenses" and therefore not relevant. *Id.* at 730 n.2. On review, *Contreras* rejected the government's proposed historical analogues—that is, our Nation has a history and tradition of punishing by death and estate forfeiture—as "too broad," and not "analogous to the facts" underlying Contreras's § 922(g)(3) predicate offense. *Id.* at 731. But *Contreras* walked through the door *Connelly* left open—that § 922(g)(3) could be applied to "some sets of circumstances," such as individuals carrying firearms while actively intoxicated. *Id.* at 731–32 (quoting *Connelly*, 117 F.4th at 282). For example, Contreras had been actively under the influence of marijuana while possessing a firearm at the time of both his § 922(g)(3) and § 922(g)(1) offenses. *Id.* at 733. After drawing on our Nation's historical tradition of intoxication laws temporarily disarming individuals—the closest analogue, as explained by *Connelly*—the *Contreras* court concluded "there is a tradition of regulating Contreras' predicate offense because he *was* intoxicated while he possessed the gun," *id.* at 732 (emphasis in original), and therefore "the

challenged regulation is consistent with the principles that underpin our regulatory tradition," *id.* at 733 (quoting *Rahimi*, 602 U.S. at 692).

The second ground was that our Nation's historical tradition supported disarming individuals while they complete their sentences. *Id.* at 732–33; *see also United States v. Goins*, 118 F.4th 794, 805 (6th Cir. 2024) (Bush, J., concurring in part) ("Limitations on the constitutional right to bear arms while on probation are supported by our nation's historical tradition of firearm forfeiture laws, which temporarily disarmed persons while they completed their sentences." (citing *United States v. Moore*, 111 F.4th 266 (3d Cir. 2024)). Contreras, for example, was also on temporary supervised release for his § 922(g)(3) offense at the time of his § 922(g)(1) offense. 125 F.4th at 733. Other cases have since upheld § 922(g)(1) as applied to individuals completing their criminal sentences. *See, e.g.*, *United States v. Giglio*, 126 F.4th 1039, 1045 (5th Cir. 2025) (holding that the government carried its burden in showing it could deprive a defendant, who "at the time of his conviction, was serving a sentence for a prior conviction").

## D

Mitchell contends that the district court erred by failing to dismiss the indictment because § 922(g)(1) violates the Second Amendment as applied to him. Acknowledging that *Bruen* "fundamentally changed" Second Amendment challenges, Mitchell engages with its two-part test. *First*, he argues the Second Amendment's "plain text" covers possession of a firearm under § 922(g)(1). *See Diaz*, 116 F.4th at 467). *Second*, he advances that the government has not satisfied its burden to warrant permanent disarmament.

In his engagement with Step Two, Mitchell contends that the government has not identified a historical analogue "sufficient to permanently disarm" him. According to Mitchell, the government—in response to Mitchell's motion to dismiss in the district court—premised its

opposition on the "clearly erroneous proposition that nothing in *Bruen* altered the constitutionality of § 922(g)(1) and that his challenge was foreclosed because the Second Amendment does not apply to those with felony convictions." Mitchell recounts that the government also nodded to another case from the Southern District of Mississippi that found § 922(g)(1) unconstitutional as applied, but otherwise "put forth no evidence" and instead rested "on now obsolete precedent allowing for the categorical disarmament of those with felony convictions." The government, as Mitchell contends, did not pinpoint "the specific predicate felony" supporting disarmament under § 922(g)(1); rather, it "broadly claimed" that laws disarming persons as "unvirtuous or untrustworthy—including Catholics in England, Native Americans and enslaved people in the early colonies, and loyalists during the Revolutionary War"—justified disarmament of *anyone* with a felony offense. Such broad examples from our Nation's history and tradition of firearm regulation, according to Mitchell, were ultimately "insufficiently specific" to him. *See Diaz*, 116 F.4th at 467.

Mitchell also challenged the district court's denial for its purported failure "to individually analyze" his as-applied challenge under applicable Supreme Court and Fifth Circuit precedent. *See Spence*, 418 U.S. at 414. According to Mitchell, the district court should have minimally applied "a *Diaz* analysis" and examined whether his § 922(g)(3) predicate conviction warranted permanent disarmament under § 922(g)(1).[4] The district court instead denied "Mitchell's motion by adopting the reasoning . . . in its previous decisions, concerning defendants with different criminal histories and prior predicate felonies." *See Diaz*, 116 F.4th at 469 ("Simply classifying

_____

[4] We had not yet decided *Diaz* at the time the district court denied Mitchell's motion to dismiss.

a crime as a felony does not meet the level of historical rigor required by *Bruen* and its progeny.").

The Government argues that the district court properly denied Mitchell's as-applied challenge to § 922(g)(1) for two reasons.

*First*, the government highlights Mitchell's "dangerousness." Mitchell "repeatedly engage[d] in assaultive conduct," including "domestic violence . . . accompanied by the actual or threatened use of a weapon." The government points to the fact Mitchell pleaded guilty to misdemeanor assault with a weapon in 2016. While on supervised release after his federal firearms conviction, Mitchell also reportedly "threaten[ed] to shoot and kill" his child's mother. Reviewing his "extensive history of violent behavior," the government reasons, provides a firm basis to reject his as-applied challenge.

The government frames its dangerousness argument around statements from the Supreme Court and Fifth Circuit that hint at possible constitutional justifications for disarmament. *See, e.g., Rahimi*, 602 U.S. at 698 ("When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed."); *United States v. Bullock*, 123 F.4th 183, 185 (5th Cir. 2024) ("The historical record demonstrates that legislatures have the power to prohibit dangerous people from possessing guns.") (per curiam) (cleaned up). It also relies on decisions from the Third and Sixth Circuits that consider "dangerousness" as a crucial factor in disarming individuals. *See, e.g., Pitsilides v. Barr*, 128 F.4th 203, 211 (3d Cir. 2025) ("[C]ourts must consider all factors that bear on a felon's capacity to possess a firearm without posing such a danger."); *United States v. Williams*, 113 F.4th 637, 650 (6th Cir. 2024) ("Historical evidence demonstrates that early English kings and Parliament alike disarmed individuals they deemed dangerous. An examination of colonial history next reveals that residents of the New World carried on this tradition.").

No. 24-60607

To connect those dots with the Nation's historical tradition of firearm regulation, the government relies on Founding-era weapon forfeitures laws—also known as "going armed" laws—in support of Mitchell's disarmament under § 922(g)(1). It also cites *Rahimi*, *Diaz*, and *Contreras* to conclude that § 922(g)(1) "shares the 'how' (disarmament) and 'why' (deter criminal conduct, protect the public, and facilitate rehabilitation) of these historical regulations." *See Contreras*, 125 F.4th at 733.

*Second*, the government argues that Mitchell's "recidivism would not have been tolerated" during the time of the Founding. Once again, it relies on his entire criminal history to contend that his "dangerousness is particularly appropriate here in the case of a defendant who has repeatedly engaged in assaultive conduct and whose recidivism would historically have been met with harsh punishment." For historical support, the government relies on *United States v. Quiroz*, 125 F.4th 713, 720 (5th Cir. 2025) (examining a 1748 Virginia statute that called for "the death penalty for a third offense of stealing a hog"), and *Diaz*, 116 F.4th at 469 n.3 (noting capital punishment for crimes). It also looks to secondary sources. *See, e.g.*, James E. Robertson, *Houses of the Dead: Warehouse Prisons, Paradigm Change, and the Supreme Court*, 34 Hous. L. Rev. 1003, 1008 n.16 (1997) (recidivists were sometimes subject to execution during Colonial era); John V. Jacobi, *Prison Health, Public Health: Obligations and Opportunities*, 31 Am. J.L. & Med. 447, 457 (2005) ("[R]ecidivists . . . were dealt with brutally, by whippings and execution."). Considering these historical examples, the government asks this court to "account [for] Mitchell's entire record, which is necessary to properly assess the extent of his violent conduct." *See Williams*, 113 F.4th at 657–68. The government concedes it did not marshal sufficient historical support in opposing Mitchell's motion to dismiss, but it maintains that it "may provide additional legal support for its arguments on appeal." *See Bullock*, 123 F.4th at 185.

No. 24-60607

E

With the law behind us, we must now apply our test to Mitchell.

1

At Step One, we must consider whether § 922(g)(1) burdens conduct protected by the Second Amendment. *Diaz*, 116 F.4th at 467. In *Diaz*, this court concluded that convicted felons are among "the people" presumptively protected by the Second Amendment and held that the "plain text of the Second Amendment covers the conduct prohibited by § 922(g)(1)." *Id.* at 466–67; *accord Morgan*, 147 F.4th at 527. Here, § 922(g)(1) as applied to Mitchell "impinges upon a right" secured by the Second Amendment and so it presumptively protects him. *Morgan*, 147 F.4th at 527.

Before moving to Step Two, we must reaffirm our proper scope of inquiry. Under our precedent, we consider "only those predicate offenses under § 922(g)(1) that are 'punishable by imprisonment for a term exceeding one year.'" *Id.* at 528 (quoting *Kimble*, 142 F.4th at 310). "Other convictions, arrests, or conduct are 'not relevant'" for purposes of this court's as-applied analysis under § 922(g)(1). *Id.* (quoting *Diaz*, 116 F.4th at 467); *see also Kimble*, 142 F.4th at 318 ("The [only] relevant consideration is a defendant's 'prior convictions that are punishable by imprisonment for a term exceeding one year,' not . . . prior conduct that did not result in a felony conviction." (quoting *Diaz*, 116 F.4th at 467)). We are bound by the scope defined in *Diaz*.

Here, despite Mitchell's extensive criminal history, his *only* prior felony conviction was § 922(g)(3). In other words, his § 922(g)(3) conviction is the only predicate offense under his § 922(g)(1) offense. *See Morgan*, 147 F.4th at 528; *see also Diaz*, 116 F.4th at 467 ("[W]e may consider prior convictions that are 'punishable by imprisonment for a term exceeding one year.'" (citation omitted)). Mitchell's state misdemeanor convictions and conduct are therefore "not relevant" for our analysis. *Diaz*, 116 F.4th at 467;

*Morgan*, 147 F.4th at 528. Against the government's request to "account [for] Mitchell's entire record, which is necessary to properly assess the extent of his violent conduct," we reject such an invitation and instead confine our inquiry to Mitchell's § 922(g)(3) conviction—the only predicate § 922(g)(1) offense—based on the rule of orderliness. *See Jacobs v. Nat'l Drug Intel. Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008) ("It is a well-settled Fifth Circuit rule of orderliness that one panel of our court may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our *en banc* court.").

To circumvent *Diaz*, the government urges us to focus on Mitchell's "dangerousness" in assessing whether § 922(g)(1) can be constitutionally applied to him by consulting his entire criminal record, including his misdemeanors. It relies on *Rahimi* for the overarching constitutional principle that "[w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed," 602 U.S. at 698, and *Bullock* for the view that "[t]he historical record demonstrates that legislatures have the power to prohibit dangerous people from possessing guns," 123 F.4th at 185. In one sense, both statements are true. But Mitchell is correct on the law in this circuit: "dangerousness" is not the governing test for disarmament under § 922(g)(1).

For starters, *Rahimi* did not sweepingly proclaim that "dangerousness" is the new standard for Second Amendment challenges. 602 U.S. at 690. Rather, it was concerned with a narrow question: "When a restraining order contains a finding that an individual poses a credible threat to the physical safety of an intimate partner, that individual may—consistent with the Second Amendment—be banned from possessing firearms while the order is in effect." *Id.* After reviewing the historical tradition of "surety and going armed laws, which involved judicial determinations of whether a particular defendant likely would threaten or had threatened another with a

weapon," the Court concluded that § 922(g)(8) "fits within our regulatory tradition." *Id.* at 698–99. It noted that its opinion should not be read to "suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse," *id.* at 698 (citing *Heller*, 554 U.S. at 626), but that § 922(g)(8) "applies only once a court has found that the defendant 'represents a credible threat to the physical safety' of another." *Id.* at 698–99 (quoting § 922(g)(8)); *see also id.* at 713–14 (Gorsuch, J., concurring) ("[W]e do not decide today whether the government may disarm a person without a judicial finding that he poses a 'credible threat' to another's physical safety . . . We do not resolve whether the government may disarm an individual permanently."). The Court concluded: "As applied to the facts of this case, [§] 922(g)(8) fits comfortably within [our Nation's firearm regulation] tradition." *Id.* at 690. Thus, *Rahimi* did not attempt to swap or displace *Bruen*'s text, history, and tradition methodology with a new, amorphous standard of dangerousness for Second Amendment challenges.

We have moreover not read *Rahimi* in the government's proposed light. *See Connelly*, 117 F.4th at 277 ("Indeed, not one piece of historical evidence suggests that, at the time they ratified the Second Amendment, the Founders authorized Congress to disarm *anyone* it deemed dangerous." (emphasis in original)); *id.* at 278 ("The government identifies no class of persons at the Founding who were 'dangerous' for reasons comparable to marijuana users."). Failing to find support in *Rahimi*, the government looks to *Bullock* to provide a lifeline, but to no avail. In *Bullock*, we reviewed an as-applied challenge to § 922(g)(1) from a defendant who had "numerous felony convictions." 123 F.4th at 184. Bullock had been convicted of aggravated assault and manslaughter after an incident in which he "shot an unarmed bar bouncer," unloaded a "barrage of bullets" into a crowd nearby, and killed a nineteen-year-old bystander. *Id.* In examining his two felonies—aggravated

26

assault and manslaughter—*Bullock* concluded there was "no doubt . . . in this context" these felonies were "dangerous and violent crimes," and therefore justified dispossession under § 922(g)(1). *Id.* at 185. To reach its conclusion, *Bullock* reiterated the fundamental point from *Diaz*—that we would review only Bullock's "underlying convictions," which "stemmed from the threat and commission of violence with a firearm." *Id.* (citing *Diaz*, 116 F.4th at 470 n.5). For these reasons, we find no tension between *Bullock* and *Diaz*.[5]

Without either *Rahimi* or *Bullock* to come to its rescue,[6] the government looks to the Third and Sixth Circuits to support its dangerousness theory. Both circuits allow courts to examine a defendant's *entire* record, including misdemeanors, to make a dangerousness assessment for purposes of as-applied challenges to § 922(g)(1). *See Pitsilides*, 128 F.4th

---

[5] Of course, a defendant's dangerousness can be viewed as a factor in an as-applied challenge under § 922(g)(1), but only to the extent that it relates to an underlying predicate conviction. *See Bullock*, 123 F.4th at 185. For example, this factor may be salient when drug dealing and trafficking are combined with firearms. *See Kimble*, 142 F.4th at 318 (holding that defendant's "predicate convictions for drug trafficking convey that he belongs to a class of dangerous felons that our regulatory tradition permits legislatures to disarm"); *see also United States v. Yanez Soza*, 513 F.3d 194, 202 (5th Cir. 2008) (crediting testimony that "drugs and guns are commonly found together and that drug dealers use guns to protect their business because of the inherent violence of the trade").

[6] The government also cites to *United States v. Isaac*, No. 24-50112, 2024 WL 4835243 (5th Cir. Nov. 20, 2024) (per curiam), where a defendant's § 922(g)(1) as-applied challenge was rejected in a two-paragraph, unpublished opinion. There, defendant had been convicted of the felony of aggravated assault with a deadly weapon for firing multiple shots at someone. *Id.* at *1. He also had been convicted of "deadly conduct" connected with an "incident where he pointed a firearm at a mother picking up her son from school," which was "a misdemeanor because he did not discharge his weapon." *Id.* at *1 n.†. In rejecting his challenge, the court observed that a defendant's having "previously misused a firearm in an attempt to harm another . . . fits easily within our Nation's historical tradition of firearm regulation." *Id.* at *1. As Mitchell points out, while *Issac* flagged that the defendant was convicted for "firing multiple shots at someone," *id.*, it was connected to the "manner and means of the offense itself, not to allegations in prior criminal events not resulting in felony convictions." *Isaac* thus does not aid the government.

No. 24-60607

at 212; *Williams*, 113 F.4th at 657–58. But we need not engage with those cases because *Diaz* controls. Without further instruction from the Supreme Court or en banc court, we are bound by our rule of orderliness.[7] *Jacobs*, 548 F.3d at 378; *Daniels*, 124 F.4th at 974 n.6.

Despite the government's reliance on *Rahimi* and *Bullock* for its position,[8] those cases must be read in proper context with *Bruen* and *Diaz*.

2

With the scope of inquiry established, we turn finally to Step Two to see if our historical laws are relevantly similar to § 922(g)(1) as applied here.

At the outset, the government argues that it did not forfeit its argument that § 922(g)(1) fits within a historical tradition of firearm regulation. Mitchell pushes back, arguing that, out of reverence for "the principle of party presentation," this court should reject the government's effort on appeal to raise new arguments as to this Nation's firearm regulatory

---

[7] We point out that, if we were "writing on a blank slate . . . a more individualized assessment of dangerousness might be appropriate when adjudicating as-applied challenges to § 922(g)(1)." *United States v. Mancilla*, 2025 WL 2610452, at *2 (5th Cir. 2025) (Elrod, C.J., concurring) (publication forthcoming). For example, the historical approach in *Williams*, 113 F.4th at 663 (Thapar, J.)—which enables courts to "evaluate a defendant's entire criminal record" and "not just the specific felony underlying" his § 922(g)(1) conduct—may be more consistent with the Nation's historical tradition under *Bruen*. Our hands are ultimately tied by *Diaz*, but it may be worth revisiting its propriety in the future.

[8] In one of its Rule 28(j) Letters, the government cites to *United States v. Allam*, 140 F.4th 289 (5th Cir. 2025), for the proposition that, when reviewing an as-applied challenge to a federal firearms statute, this court needs to "analyze its application to the particular circumstances of an individual." *See Allam*, 140 F.4th at 295. But such reliance is misplaced. *Allam* concerned a constitutional challenge to 18 U.S.C. § 922(q)(2)(A), which prohibits possession of a firearm within 1,000 feet from school grounds. *Id.* at 291. The relevant scope of inquiry at issue here concerns felony predicates underlying as-applied challenges to a § 922(g)(1) conviction. *Diaz*, 116 F.4th at 467.

tradition and "limit its analysis to the historical analogues" offered by the government below. *See Bruen*, 597 U.S. at 25 n.6.

To begin, we find that the government did not forfeit its argument. Notwithstanding the party presentation principle and its centrality to the adversarial testing of legal theories, the government did argue—though, swiftly—that our Nation's historical tradition supported § 922(g)(3)'s disarmament of Mitchell. Even so, *Bullock* provides authority that the government may raise new historical analogues on appeal: "Because the Second Amendment analysis is a legal inquiry into the text and history related to the relevant regulation, the government may provide additional legal support for its arguments on appeal." 123 F.4th at 185.

With that behind us, we must now compare these examples to § 922(g)(1) as applied to Mitchell's § 922(g)(3) offense, asking whether they are "relevantly similar" at Step Two. *Bruen*, 597 U.S. at 29. This task demands assessing whether "the historical analogue and § 922(g)(1), as applied here, impose a comparable burden on the right to armed self-defense—and whether that burden is comparably justified." *Morgan*, 147 F.4th at 529. Consider the government's analogues. It points to two types of laws: (1) "going armed" laws and (2) recidivism laws. Each fails under *Bruen*.

*Going armed laws.* The government first argues that § 922(g)(1) as applied to Mitchell can be supported by this Nation's historical "going armed" laws. This historical analysis is derived from its "dangerousness" argument, which requires reviewing Mitchell's non-felony-related-offenses and conduct. Even so, *Diaz* provides a detailed historical exegesis of these laws. *See* 116 F.4th at 470–71. At their core, going armed laws prohibited people from "riding or going armed, with dangerous or unusual weapons, to terrify the good people of the land." *Id.* at 464 (cleaned up). They targeted "those who had menaced others with firearms" and "disrupted the public

order" through acts that could lead to "actual violence." *Id.* at 470–71 (cleaned up). Early laws in our Nation's history "prohibit[ed] bearing arms in a way that spreads 'fear' or 'terror' among the people." *Bruen*, 597 U.S. at 50. And *Rahimi* found such laws to be relevantly similar historical precursors to § 922(g)(8). 602 U.S. at 697–98.

Here, the going armed laws are not relevantly similar to § 922(g)(1) as applied to Mitchell. True, both share the same "how" in imposing a comparable burden on the right to defense—as they each impose "'permanent arms forfeiture as a penalty' . . . once an individual was convicted of a disqualifying offense, whether for 'going armed' or for unlawful firearm use." *Morgan*, 147 F.4th at 529 (quoting *Diaz*, 116 F.4th at 467, 471); *id.* (explaining that the "shared penalty reinforces the historical analogy"). That said, these historical laws do not share the same "why" in being comparably justified as applied to Mitchell's § 922(g)(3) predicate offense. While this Nation's historical tradition shows "that legislatures have the power to prohibit *dangerous* people from possessing guns," *Bullock*, 123 F.4th at 185 (emphasis added), there is simply no evidence underlying Mitchell's § 922(g)(3) conviction—a non-violent offense—that he was "found to threaten the physical safety of another," *Rahimi*, 602 U.S. at 698; *see also Connelly*, 117 F.4th at 278 ("Founding-era governments took guns away from those perceived to be dangerous."). The government does not establish how Mitchell—an admitted habitual marijuana user who smoked three marijuana cigarettes each day, according to the PSR in his § 922(g)(3) case—can be reasonably analogized to have "menaced others with firearms," or "disrupted the public order" through acts likely to lead to "actual violence." *See Diaz*, 116 F.4th at 471 (cleaned up).

To establish his dangerousness as analogized to going armed laws, the government must necessarily fix its aim *beyond* Mitchell's § 922(g)(3) predicate offense. But that request requires sidestepping our circuit

precedent, *see Diaz*, 116 F.4th at 467; *Morgan*, 147 F.4th at 528, which we cannot do absent further instruction, *Jacobs*, 548 F.3d at 378; *Daniels*, 124 F.4th at 974 n.6. In short, going armed laws are too broad to be sufficiently analogous to Mitchell's § 922(g)(1) conviction. *See Diaz*, 116 F.4th at 467 (requiring historical precursor to be "analogous to" the defendant).

*Recidivism laws.* The government next argues that § 922(g)(1) as applied to Mitchell can be supported by this Nation's historical laws punishing "recidivism." Once again, this historical analysis is derivative of the government's overarching dangerousness argument, which is premised on evaluating Mitchell's *entire* criminal record and looking beyond his § 922(g)(3) offense. To tie a bow on this point, the government cites to *Quiroz*, where this court reviewed a constitutional challenge to 18 U.S.C. § 922(a)(6), which prohibits making a false statement while buying a firearm, as well as a challenge to § 922(n)—a statute that prohibits receiving a firearm while under indictment for a felony. 125 F.4th at 715. *Quiroz* reviewed state laws imposing the death penalty for several crimes, including a 1748 Virginia statute that "imposed the death penalty for a *third offense* of stealing a hog." *Id.* at 720 (emphasis added). The government seizes on that specific capital punishment law in this case to draw a more general recidivism analogy. It cites to other historical sources to conclude that recidivists were subject to execution during the Founding era and that they "were dealt with brutally, by whippings and execution." None of these are helpful.

Here, the recidivism laws cited are not relevantly similar to § 922(g)(1) as applied to Mitchell. Of course, § 922(g)(1) shares the same "how" as the cited Virginia law in placing a comparable burden on the right to defense. Like § 922(g)(1)'s permanent ban on the possession of firearms, "if one is dead, they can no longer possess a firearm." *Contreras*, 125 F.4th at 730. Yet these laws do not share the same "why" because they are not comparably justified as applied to Mitchell's § 922(g)(3) predicate offense.

For starters, the government's recidivism argument seemingly hinges on the success of its dangerousness proposal—that is, it presupposes this court will look beyond § 922(g)(3). Once that door is closed, Mitchell cannot be properly characterized as a recidivist because the only relevant offense for our purposes is § 922(g)(3). *Diaz*, 116 F.4th at 467; *Morgan*, 147 F.4th at 528.

But even engaging with the government's proposed historical analogue, the primary law cited is the 1748 Virginia statute, which punished repeat offenders charged with theft. 125 F.4th at 720. Certainly, our Nation has a longstanding historical tradition of "severely punishing" individuals "who have been convicted of theft." *Diaz*, 116 F.4th at 468–69. *Quiroz* picked up on that historical tradition, which explains why it cites the Virginia statute for the view that "[s]tate laws . . . imposed the death penalty for a number of crimes," such as theft. 125 F.4th at 719–20. The government's attempt to creatively recast Virginia's capital punishment theft statute in a more expansive light—here, marijuana use—requires "analogical reasoning" that stretches far beyond *Bruen*'s contemplated reach. *Connelly*, 117 F.4th at 282. "[T]he *Bruen* inquiry, as articulated in *Diaz*, requires not only showing that someone convicted of *any* felony was punished in a comparable way but that someone convicted of an *analogous* felony was punished in a comparable way." *Contreras*, 125 F.4th at 731 (emphases added). At bottom, the government's recidivism laws are too expansive to be analogous to Mitchell's § 922(g)(1) offense. *See Diaz*, 116 F.4th at 467 (stating that historical precursors must be "analogous to" the defendant).

We note that the government did not point to other historical analogues to justify Mitchell's disarmament under § 922(g)(1). Mitchell responds that "[t]here is no sufficient tradition of disarming someone with a prior conviction for . . . § 922(g)(3) who was not *intoxicated* at the time." In *Connelly* and *Daniels*, the government put forth intoxication laws to justify § 922(g)(3)'s constitutionality. 117 F.4th at 275; 124 F.4th at 976. Not so here.

The government never advanced these laws. It only later raised Mitchell's marijuana use—in relation to dangerousness—in its Rule 28(j) Letter.

As a matter of party presentation, we could limit our analysis to the "history and tradition before us," *Connelly*, 117 F.4th at 282—the government's going armed laws and so-called recidivism laws—and call it a day. *Bruen*, 597 U.S. at 25 n.6 ("The job of judges is not to resolve historical questions in the abstract; it is to resolve *legal* questions presented in particular cases or controversies." (emphasis in original)). *Bruen* itself contemplates that, based on the principle of party presentation, courts *may* "decide a case based on the historical record compiled by the parties." *Id.*

But may does not mean *must*. We have, for example, conducted our own supplemental historical research when reviewing *Bruen* challenges. *E.g., Diaz*, 116 F.4th at 468 (explaining the findings of the court's "own research" with respect to the history of "those convicted of horse theft—likely the closest colonial-era analogue to vehicle theft," as opposed to the government's cited "laws targeting the crime of theft"). *Contreras* provides an especially useful example where we rejected the government's proposed analogues but nonetheless relied on historical analogues outside the record.

In *Contreras*, the government supported § 922(g)(1)'s constitutionality by pointing to our Nation's history and tradition of punishing felonies by death and permanent estate forfeiture. 125 F.4th at 730. The court concluded these analogues were "too broad" and not "analogous to the facts" of the § 922(g)(3) predicate offense. *Id.* at 731. In reviewing the Nation's historical tradition, *Contreras* analyzed Founding-era regulations that banned presently intoxicated persons from carrying weapons—even though the government did not raise them—and held that "there is a tradition of regulating Contreras' predicate offense because he *was* intoxicated while he possessed the gun." *Id.* at 732 (emphasis in original).

No. 24-60607

*Contreras* held that § 922(g)(1) was "consistent with the principles that underpin our regulatory tradition." *Id.* (quoting *Rahimi*, 602 U.S. at 681).[9]

Like *Contreras*, the government's proposed historical analogues are too broad as applied to Mitchell. Intoxication laws, by contrast, bring this case into closer alignment with our historical tradition and therefore provide a better conceptual fit under these facts. *See Connelly*, 117 F.4th at 279 (noting that, for drug regulation, including marijuana, "intoxication via alcohol is the next-closest historical analogue that we can look to" (cleaned up)).

*Connelly* conducted a comprehensive analysis of our Nation's historical tradition of regulating firearms through intoxication laws. *Id.* at 279–82. In that case, we held that, based on the "history and tradition before us," it supported "at most . . . a ban on carrying firearms while an individual is *presently* under the influence." *Id.* at 282 (emphasis in original). "These laws may address a comparable problem—preventing intoxicated individuals from carrying weapons—but they do not impose a comparable burden on the right holder." *Id.* at 281. Our Nation's historical intoxication statutes furnish "support for banning the *carry* of firearms *while actively intoxicated*," whereas § 922(g)(3) takes it a step further in more restrictively banning "*all* possession, and it does so for an undefined set of users even while they are not intoxicated." *Id.* at 281–82 (emphases in original) (cleaned up).

Where *Connelly* left off for § 922(g)(3), *Contreras* picked up for § 922(g)(1). There, the government identified specific felonies that were not

---

[9] The other basis in *Contreras* for holding § 922(g)(1) constitutional as applied to the defendant's § 922(g)(3) offense was that our Nation's history and tradition supported disarming individuals who were completing their sentences. 125 F.4th at 732–33. There, Contreras was on temporary supervised release for his § 922(g)(3) offense at the time of his § 922(g)(1) arrest, therefore falling within the ambit of this tradition. *Id.* Here, because Mitchell was not completing his sentence for his § 922(g)(3) offense at the time of his § 922(g)(1) arrest, *Contreras*'s alternative basis is inapposite.

analogous to the facts, but turned its attention to the historical record: "While the Founding generation had no occasion to consider the relationship between firearms and intoxication via cannabis, it was familiar with intoxication via alcohol that was copiously consumed much like we are currently familiar with a proliferation of people ingesting marijuana." 125 F.4th at 732. After embracing *Connelly*'s view that alcohol was the closest analogue, *Contreras* concluded "there is a tradition of regulating [Contreras' § 922(g)(3)] predicate offense because he *was* intoxicated while he possessed the gun." *Id.* at 732 (emphasis in original). In fact, Contreras was presently intoxicated for both his § 922(g)(3) and § 922(g)(1) offense. *Id.* at 733.

Here, the intoxication laws are not relevantly similar to § 922(g)(1) as applied to Mitchell. While these laws may perhaps share the same "why" in imposing a comparably justified burden—that is, to "deter criminal conduct, protect the public, and facilitate rehabilitation," *id.*—they do not share the same "how" in imposing a comparable burden on Mitchell. While both laws involve a form of disarmament, § 922(g)(1) imposes a far more severe restriction because it involves "permanent disarmament," in contrast to our Nation's historical "laws temporarily disarming intoxicated individuals." *Id.* Thus, if *Connelly* held that § 922(g)(3) is "much broader than historical intoxication laws," then applying our Nation's same regulatory tradition to Mitchell's § 922(g)(1) offense, which imposes a *permanent* ban on firearm *possession*, compels the same conclusion here. At heart, these laws do not share the same "how" in imposing a comparable burden on Mitchell.[10]

---

[10] The Supreme Court recently granted certiorari in *United States v. Hemani*, 2025 WL 354982 (5th Cir. 2025) (per curiam), *cert. granted*, No. 12-1234, 2025 WL 2949569 (U.S. Oct. 20, 2025). There, the question presented is "[w]hether 18 U.S.C. § 922(g)(3) . . . violates the Second Amendment as applied to respondent." Even if *Hemani* disagrees with our interpretation of § 922(g)(3), that would not affect the outcome here, which is

No. 24-60607

As applied to Mitchell, § 922(g)(1) limits his Second Amendment rights more than our Nation's historical tradition would allow under these facts. For starters, unlike Contreras, who was found with eight grams of marijuana, packaging, a scale, and marijuana residue with the smell of marijuana emanating from his car at the time of his § 922(g)(1) offense, there is no evidence that Mitchell was actively under the influence of marijuana while in possession of a firearm at the time of his § 922(g)(1) offense. *Contreras*, 125 F.4th at 728. The government cites to examples of intoxication, but each took place while he was on court supervision, not while he was possessing a firearm.

Nor do we have sufficient evidence of active intoxication for Mitchell's § 922(g)(3) offense. At most, the PSR indicates that Mitchell was a "drug user" who has "used marijuana the past three years." This evidence may be illustrative of Mitchell's habitual marijuana use and probative of whether he might have been intoxicated at the time of his § 922(g)(3) offense. But such evidence pales in comparison to the evidence of active intoxication in *Contreras*. There, an officer conducted a "traffic stop on Contreras' car, smelled marijuana, and searched the vehicle, finding [thirty-three] grams of marijuana and pictures in his phone of Contreras possessing firearms and marijuana." *Id.* at 730. Afterward, police arrested Contreras before it "searched his home and found a 9-millimeter Glock and several magazines of ammunition." *Id.* He was found "armed while intoxicated." *Id.* at 733.

By contrast, in this case, after a search of the vehicle where Mitchell was located, the officers found a loaded .40 caliber pistol and a small bag of marijuana. Mitchell admitted to being a drug user but denied ownership of

---

related to permanent disarmament under § 922(g)(1). The government has not met its burden to proffer a relevantly similar historical analogue for permanent disarmament.

the drugs and the firearm in the vehicle. He later admitted over a recorded jail call that the firearm, which had been reported as stolen, was in his possession. There was otherwise no evidence confirming that he was actively intoxicated while possessing a firearm.

Without sufficient evidence of present intoxication, such as the type of evidence in *Contreras*, Mitchell's admission of being a habitual marijuana user is not enough to justify § 922(g)(1)'s permanent ban on his firearm possession. The implication of a ruling to the contrary would be that Michell was *always* intoxicated from age nineteen onward based on his admission, and our historical laws could be applied to him at *any* point during that period. Yet there is a seismic "difference between an actively intoxicated person and an 'unlawful user' under § 922(g)(3)." *Connelly*, 117 F.4th at 282. While an unlawful user includes regular users, like Mitchell, "the temporal nexus is most generously described as vague," as it fails to "specify how recently an individual must 'use' drugs to qualify for the prohibition." *Id.* (citing 27 C.F.R. § 478.11). Because we do not have sufficient evidence that confirms Mitchell was intoxicated while possessing a firearm as to his § 922(g)(1) and § 922(g)(3) conduct, we hold that our Nation's historical intoxication laws do not impose a comparable burden on him and therefore fail under *Bruen*.

\* \* \*

"The constitutional right to bear arms . . . is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Bruen*, 597 U.S. at 70 (quoting *McDonald*, 561 U.S. at 780). Our Framers to the Constitution and Bill of Rights sought to design a structure of government that prudently balanced "democratic self-government and the protection of individual rights against excesses of that form of government." *Rahimi*, 602 U.S. at 714 (Kavanaugh, J., concurring). When executing our duty to "say what the law is," *Marbury v. Madison*, 1

No. 24-60607

Cranch 137, 177 (1803), as "bulwarks of a limited Constitution," FEDERALIST NO. 78 (Hamilton), we do not implement our own value-laden views about the policy outcome today. That is not our role. We recognize that the Second Amendment may have "controversial public safety implications." *McDonald*, 561 U.S. at 782. But our judicial function requires us to interpret the meaning of the Constitution by examining its text and our Nation's historical tradition of firearm regulation under *Bruen*, while also adhering to our circuit precedent in this rapidly developing area of law.

Guided by history and constrained by precedent, we hold that § 922(g)(1) is unconstitutional as applied to Mitchell's § 922(g)(3) predicate offense. Under *Bruen*, our Nation's historical tradition of using intoxication laws to prohibit carrying firearms while presently intoxicated does not support permanent disarmament of a marijuana user who was not presently intoxicated while in possession of a firearm. Our precedents further instruct that being a habitual marijuana user, without more, is insufficient to justify disarmament under § 922(g)(3). *Connelly*, 117 F.4th at 282 (holding that the government could not apply § 922(g)(3) to a defendant based entirely on her "habitual or occasional drug use"); *Daniels*, 124 F.4th at 970 (same). That same tradition holds true for § 922(g)(1) as applied to Mitchell in this case.[11]

Because we hold that § 922(g)(1) is unconstitutional as applied to Mitchell, we need not address Mitchell's alterative grounds for reversal.

---

[11] We do not hold that Mitchell may possess a firearm. For example, 18 U.S.C. § 922(g)(9) prohibits individuals who have been convicted of domestic violence misdemeanors from possessing a firearm. Despite Mitchell's conviction for a domestic violence misdemeanor in November 2017, the government did not charge Mitchell for violating § 922(g)(9). We thus express no view on the constitutionality of that provision either facially or as applied to Mitchell.

No. 24-60607

## IV

Accordingly, we REVERSE the district court's denial of Mitchell's motion to dismiss and VACATE the judgment of conviction and sentence. The government's motion to supplement the record is DENIED as moot.

No. 24-60607

Haynes, *Circuit Judge*, dissenting:

I respectfully dissent from the reversal of the district court's denial of Mitchell's motion to dismiss his indictment.

Notably, I concur with the district court's decision to deny his request to dismiss his indictment. Our cases have evolved since the district court decided this case, but its basic conclusion that Mitchell's prior felony conviction did not require dismissal for his "as-applied" challenge was correct, even though there was little said by Mitchell about the as-applied. I concur with what the district court judge said but, in addition, I think the bulk of the appeal should be reviewed for plain error because the as-applied challenge was very limited when raised in the district court. I would conclude that there was no plain error.

However, plain error aside, looking to our prior case of *United States v. Contreras*, it is sufficient to uphold a § 922(g)(1) conviction where that person was previously convicted under § 922(g)(3) and was intoxicated when he had the gun. 125 F.4th 725, 728–33 (5th Cir. 2025). This case is like *Contreras*. Here, it is clear Mitchell was intoxicated at the time of his initial felony since he was using marijuana three times a day. Moreover, I don't see any evidence that he has stopped using marijuana constantly, so I conclude that he was also intoxicated when he committed the offense that is the subject of this case. Mitchell's as-applied challenge should fail for that reason. But if there is some question about that, we should remand for the district court to consider, not vacate the conviction and throw out the indictment.

Additionally, when the Supreme Court issued *Bruen*, it was not seeking to have felons carry guns. *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). It focused on the "law-abiding" petitioners and the fact that the New York statute in play in that case was overly restricting such people from carrying guns. *Id.* at 15. Indeed, it showed that in *United*

*States v. Rahimi*, 602 U.S. 680 (2024). It noted: "Since the founding, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms." *Id.* at 690. The historical record demonstrates "that legislatures have the power to prohibit dangerous people from possessing guns." *United States v. Bullock*, 123 F.4th 183, 185 (5th Cir. 2024) (per curiam) (citation omitted), *cert. denied*, No. 25-5208, 2025 WL 2824426 (U.S. Oct. 6, 2025). This defendant is clearly in that arena, so we should not require that his indictment be dismissed.

Mitchell's conduct during supervised release relies on his original felony conviction and strongly shows his dangerousness. After serving time for his § 922(g)(3) offense and while on supervised release, the district court found that Mitchell had engaged in assaultive conduct. During one such instance that led to his revocation, not only was it reported that Mitchell "push[ed]," "chok[ed]," and "punch[ed]," the mother of his child (during which time "she began to pepper spray him"), but he reportedly "pull[ed] a large portion of her hair out" and then "threaten[ed] to shoot and kill her." I conclude that his supervised-release conduct can and should be considered because it is part of his initial felony.

It is not the same as the misdemeanor conduct that our rule of orderliness case does not want us to rely on. *See United States v. Diaz*, 116 F.4th 458, 467 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 2822 (2025). We already recognize that "facts beyond [a] single qualifying conviction" may be relevant where that conduct is part of the predicate felony. *United States v. Morgan*, 147 F.4th 522, 528 (5th Cir. 2025), *reh'g en banc denied*, No. 24-30561 (5th Cir. Oct. 20, 2025). Such conduct is "revealing." *Id.* Similarly, though it occurs later, conduct while on supervised release should be considered as part of the underlying felony conviction and should be relevant when assessing the prior felony. Supervised release flows directly from the offense of conviction. Indeed, "supervised release punishments arise from and are

treat[ed] . . . as part of the penalty for the initial offense." *United States v. Haymond*, 588 U.S. 634, 648 (2019) (citation modified). Even focusing on just the felony conviction, his supervised release—which was part of that conviction—shows that he caused physical harm. I conclude we can and should consider that part of the felony conviction and that would also mean we must affirm the district court's judgment.

I do not think that our prior cases require us to reverse. But even assuming arguendo that the majority opinion is correct in concluding that our precedent, which it said "constrains" us here, would require reversal, we should put this case in abeyance. The majority opinion relies strongly on *United States v. Connelly*, 117 F.4th 269 (5th Cir. 2024). That case did not get petitioned to the Supreme Court. However, a subsequent case that was unpublished and relied on the parties agreeing to a summary affirmance was based entirely on that *Connelly* case. *United States v. Hemani*, No. 24-40137, 2025 WL 354982, at *1 (5th Cir. Jan. 31, 2025) (per curiam) (unpublished). The Government filed a petition for certiorari, which the United States Supreme Court has granted. *United States v. Hemani*, No. 24-1234, 2025 WL 2949569, at *1 (U.S. Oct. 20, 2025). While that case is about § 922(g)(3) directly, the decision of the Supreme Court will be very meaningful in deciding issues that are relied upon by the majority opinion.

We have various cases that say that relying on a particular felony conviction is enough for an as-applied challenge to § 922(g)(1) to fail. *See, e.g.*, *United States v. Kimble*, 142 F.4th 308, 318 (5th Cir. 2025), *petition for cert. filed*, (U.S. Sep. 24, 2025) (No. 25-5747); *United States v. Alaniz*, 146 F.4th 1240, 1241–42 (5th Cir. 2025) (per curiam); *United States v. Clark*, 148 F.4th 785, 788 (5th Cir. 2025); *see also Diaz*, 116 F.4th at 469–72. Put another way, we have plenty of cases where the prior conviction avoids the as-applied challenge such that the § 922(g)(1) offense comports with the Second Amendment. Accordingly, to me, it makes great sense at a minimum to place

No. 24-60607

this case in abeyance so we can review what the Supreme Court holds in *Hemani* to determine whether Mitchell's § 922(g)(3) conviction is sufficient to support his § 922(g)(1) conviction.

Accordingly, I respectfully dissent.